THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. JOHN PEREZ, Defendant-Appellant.

First District (1st Division)   No. 1—89—1268

Opinion filed January 21, 1992.

Michael J. Pelletier and James Chadd, both of State Appellate Defender's Office, of Chicago, for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb, Steven Klaczynski, and William P. Pistorius, Assistant State's Attorneys, of counsel), for the People.

PRESIDING JUSTICE BUCKLEY delivered the opinion of the court:

After a jury trial, defendant John Perez was found guilty of murder (Ill. Rev. Stat. 1987, ch. 38, par. 9—1(a)(1)) and sentenced to a 25-year term of imprisonment. Defendant contends on appeal that the circuit court erred in denying his motion to suppress statements on the grounds they were the fruit of an illegal arrest and involuntary. Defendant further contends that he was denied a fair trial when the State improperly introduced testimony that a key witness made a prior consistent statement and then argued later in closing that this witness was more credible because he consistently told the same story. We affirm.

Prior to trial, a hearing was held regarding defendant's motion to suppress statements; the following evidence was produced.

Chicago police detective Robert O'Leary testified that on September 25, 1987, while investigating the homicide of the victim, Gerald Gains, he spoke with Garfield Birmingham. Birmingham told O'Leary that he sold drugs for a living from his apartment at 6241 North Kenmore, apartment No. 214 in Chicago, and that the victim, who had worked for him, was fired for using drugs. Birmingham further stated that he hired defendant and a man named Peter as bodyguards for his drug transactions. Defendant and Peter told Birmingham that they had a 9-millimeter chrome automatic handgun which they would point at customers while hiding during drug transactions. Birmingham gave O'Leary defendant's address.

Detective Lawrence Thezan testified that he worked the evening shift of September 25, 1987, and that he also spoke with Birmingham. Birmingham told Thezan that defendant was in the building where the victim was shot and that defendant knew about the incident. Birmingham informed Thezan where defendant lived and that a 9-millimeter chrome handgun was in the apartment where they sold drugs. At the time of this conversation, Thezan was aware that the bullet which killed the victim came from a large caliber, semi-automatic pistol. Based on this information, Thezan and his partner, Detective Wojtowicz, went to defendant's house. The detectives spoke with numerous individuals at the side of the building; a few of these individuals went into the building and retrieved defendant. The detectives identified themselves, told defendant why they were there and asked him if he would go to Area Six headquarters with them. Defendant agreed to go; he was not handcuffed.

At the station, now about 8 or 9 p.m., defendant was taken to an interview room on the second floor. There, the detectives explained to defendant what they knew and asked him if he had any information about the murder. Defendant told the detectives that he was at apartment No. 214 at 6241 North Kenmore with Peter on September 24, 1987. Defendant stated that Peter owned a 9-millimeter hand gun. Around 7 p.m. that evening, a Jamaican man known only as Earl-16 came to the apartment and asked if they had any beer. They did not, so Earl-16 and Peter gave defendant some money to purchase beer. The victim arrived and spoke with Earl-16. Defendant then left to go to the store.

Detective Thezan asked defendant if he knew where they could find Peter and Earl-16. Defendant said he knew that Peter was Jamaican but did not know where he lived or his phone number; if defendant ever

needed to meet with Peter, he would see him in Jamaican bars. Defendant stated that he had no information on Earl-16.

After the detectives returned from their unsuccessful attempt to locate Peter and Earl-16, they again talked with defendant, who related that Peter kept the 9-millimeter gun in the toilet tank. Again, after defendant provided them with this information, the detectives left the station and went to the apartment to verify this lead. They were unable to locate the gun at the apartment but did find some papers with the victim's name on them. During the time the officers were away, defendant remained in the police station.

Detective O'Leary testified that he arrived at work around 8:30 a.m. on September 26 and spoke with the midnight shift. At 9:30 a.m., O'Leary and his partner, Detective Kajari, went and spoke with defendant. Defendant told them that a man named "Cratches" came over to the apartment and asked for a couple of beers. Cratches then told defendant and Peter that Earl-16 had shot someone, perhaps Gaines. Defendant told the detectives that he could point out Earl-16's apartment. The detectives and defendant then proceeded to where Earl-16 lived. The detectives exited the vehicle to see the apartment manager, who told them that a Jamaican named Herliz Vanzie lived in the building. The detectives went to his apartment but nobody was there. During this time, defendant remained unhandcuffed and alone in the back seat of the squad car.

On the way back to Area Six headquarters, the three stopped and got something to eat. At headquarters, the detectives checked their records on Herliz Vanzie and learned that he had the nickname of Earl. They again left the station and unsuccessfully tried to locate Earl-16. During this time, defendant remained in an interview room.

Detectives Thezan and Wojtowicz continued the investigation when their shift began around 4:30 p.m. on September 26. At this time, defendant was still at the police station, but according to Thezan was not in custody, was free to go at any time and did not ask to leave.

The detectives continued their search for Earl-16 during the night. Later that evening, Earl-16 was located and interviewed in a separate interview room. Thezan explained that defendant did not want to be seen by any individual being brought into the station. Earl-16 told the detectives about his presence in apartment No. 214 and that Cratches was a friend of his. He gave the detectives information as to where Cratches could be located, but the information proved unuseful. Thezan then went and got some hamburgers for defendant. Later that night, Detectives Thezan and Wojtowicz again talked to Birmingham, who came to Area Six. He said that he had been stabbed while looking for

Peter. Birmingham was assisting the detectives in their search for Peter.

Detective O'Leary testified that when he started work on September 27 at 8:30 a.m., Cratches (Duane Sammons) was already there. Cratches was interviewed and stated that at Earl-16's request, he had gone over to apartment No. 214 to get a couple of beers. Defendant and Peter were in the apartment. He got two beers and then returned to the apartment where Earl-16 was located. Following this interview, Detectives O'Leary and Thezan again tried to find Peter but were unsuccessful. Defendant remained in an interview room during this time.

When the detectives returned to the station, defendant told them that they might be able to find the gun under the refrigerator or in a vent on the stove at the apartment. No gun was found. The detectives brought food back for defendant, Earl-16 and Cratches, who were all in separate rooms. O'Leary stated that they did not let Earl-16 and Cratches know defendant was there in an attempt to protect defendant because he was the one that gave the detectives their names and other information regarding their possible involvement in the murder.

After eating, the detectives interviewed Earl-16 and Cratches again. Cratches stated that Earl-16 left Cratches' girl friend's apartment and went over to the apartment to get two beers. Cratches next went to the apartment, and defendant opened the door pointing a 9-millimeter chrome handgun at him. Cratches told defendant to put the gun down. Defendant replied, "You guys are always ripping us off." Cratches responded that he is Jamaican and defendant put the gun down to his side. Cratches denied telling defendant anything about the shooting because he did not learn of it until the next day.

During Earl-16's interview, Earl-16 said that he went over to apartment No. 214 to get a couple of beers; defendant, Peter and a female were in the apartment. They did not have any beer so he and Peter gave defendant some money. During this time, the victim came over and began arguing with defendant and Peter about some furniture of his that he wanted. Defendant told him that he would have to talk to Birmingham because it was his apartment. Defendant eventually left the apartment followed first by the woman and then a short while later by the victim. A few minutes after the victim had left, defendant came back and went into the kitchen. He then left with his coat over his hand. Earl-16 left and went to Cratches' girl friend's apartment and told Cratches to go back and get the beer.

After these interviews, Detectives O'Leary and Thezan discussed discrepancies between the stories given by defendant, Earl-16 and Cratches. They then went back into the interview room with defendant and

explained to him that they had been talking to witnesses who had been giving consistent stories which were inconsistent with his story. They told defendant what the discrepancies were and read defendant his rights. Defendant acknowledged that he understood those rights and wished to waive them. It was now 7:30 p.m., about 48 hours after the police first contacted defendant. Defendant then proceeded in the presence of the two detectives to make certain admissions with regard to the murder. After making the oral admission, defendant was placed under arrest and handcuffed for the first time. The detectives contacted Assistant State's Attorney Judith Mondello of felony review, who came and took a statement from defendant. Defendant, O'Leary and Mondello all signed the bottom of each page of the written statement.

Detectives Thezan and O'Leary testified that no one at anytime threatened, pushed, shoved, struck, kicked, strangled or abused defendant in any way. Defendant was never promised anything in return for his statements, was never refused food, drink or bathroom facilities, was never locked in an interview room and remained free to leave the entire time. According to the detectives, defendant was cooperating with the police. Defendant would give the detectives information which they would attempt to confirm. Both testified that Earl-16 and Cratches were brought to the station based on information defendant provided.

Defendant testified on his own behalf. He stated that he was sitting at home on September 25, 1987, when three police officers arrived without a warrant. The officers grabbed him, patted him down and put him in the back of a police car. The officers drove a short distance, stopped the car, told defendant to get out, handcuffed him, placed him back in the car and drove to the station where he was locked in an interview room. According to defendant, while in the interview room, the officers gave him no food and would not let him use the bathroom. When he asked to use one, he could hear the officers laughing outside the door. Defendant was forced to use a garbage can as a toilet.

Defendant testified that on September 26, around 1 p.m., he left the interview room with Detectives Kajari and O'Leary to go looking for an individual he had told them about. Defendant testified he could point out a building where he had seen that individual exit. When they arrived at the building, defendant went inside with the detectives but was not handcuffed. They went in and talked to a lady manager. The three then went upstairs. One detective told the defendant to stand with him by the stairwell out of view of the door while the other detective went to the door and knocked. No one answered.

On the way back to the station, defendant told the detectives he was hungry and so they stopped at a gas station. Defendant testified that he

went in alone and bought cigarettes, a Snickers bar and a 7-Up with his own money. Defendant stated, "I didn't try to run from them and nothing, I try to assist them." After they left the gas station, they went to another police station where the detectives did some research. Defendant stated: "I try to relax, try to assist them with whatever I could help them." They left this police station around 3 or 4 p.m. and returned to Area Six headquarters. Defendant testified that he was again placed in a locked interview room. Sometime later that evening a uniformed police officer brought him a Big Mac and a 7-Up. Defendant also stated he ate again early the next morning.

On the morning of the 27th, defendant was transferred to another room where he was handcuffed to the wall. The detective kept telling him they knew he committed the murder. Defendant denied this and alleged that Detective Kajari started beating him. When the assistant State's Attorney came, O'Leary told her what to write down. She wrote it on a yellow piece of paper. Defendant claimed he never told the assistant State's Attorney what to write. O'Leary told defendant he had to sign the statement, but he would not. Defendant stated that he never received his *Miranda* rights. After he refused to sign, the assistant State's Attorney ran out of the room. A detective then told defendant that if he signed the statement they would let him go. When the assistant State's Attorney came back in, she also told defendant that he could go home if he signed the statement. Defendant testified that he signed the statement only because he had been beaten and denied food and access to the bathroom during the preceding 48 hours.

During cross-examination, defendant stated that he did not sign the statement. Defendant claimed that the police must have photocopied his signature and tried to "prefabricate" it so it would look like he signed the statement. Defendant later stated that he did sign the bottom of all three pages. Defendant testified that, even though the statement said he was given food, drink, cigarettes and allowed to use the bathroom, this was not true and he only signed it because he was forced.

Defendant testified that in the early morning on September 27, Detective Kajari came in and beat him for approximately 15 to 30 minutes. Kajari then left but came back about 40 minutes later and beat him again for approximately 20 to 30 minutes. Defendant said these beatings occurred throughout the day and up until the assistant State's Attorney came. Defendant said that during one session he was hit in the left eye.

Defendant said he told the assistant State's Attorney that he did not commit the murder, but she wrote what Detective O'Leary told her to write. Defendant said that he told the police that he heard Cratches tell Peter that Earl-16 did the shooting. This is why he was helping the po-

lice find Earl-16. Defendant said he was at the apartment because Birmingham took him there instead of dropping him off at his sister's house.

The State called three witnesses in rebuttal. Carlos Martinez, a paramedic for the Cook County Department of Corrections, testified that he conducted the intake procedures for the defendant on September 28, 1987. Martinez took defendant's medical history and did a visual inspection of defendant from the waist up. Defendant told Martinez that he received a "blunt trauma" on September 26 or 27. Defendant stated that he had no complaints or physical problems and that he was in good health. Defendant never told Martinez that he was beaten by police or that he had any pain in his lower back. Martinez noted that defendant had some swelling on his right eye but did not note any bruises to defendant's upper torso.

Dr. Aaron Hamb, a physician at Cermak Health Services of the Cook County Department of Corrections, testified that defendant complained of pain to the coccyx (tailbone) area during a March 1988 examination. Defendant related to Hamb that Chicago police officers had pulled a chair out from beneath him and that this incident caused his pain. At the examination, Hamb looked through defendant's records and found no record of the type of incident defendant claimed. An X ray was taken, and the radiologist reported that defendant's tailbone had a possible injury.

Assistant State's Attorney Judith Mondello testified that she worked for felony review on September 27, 1988. On that date, she went to Area Six at 9:45 p.m. and first spoke with Detectives Thezan and O'Leary. Mondello then reviewed all the available police reports and interviewed the witnesses. She then went into the interview room where defendant was sitting. She introduced herself as a lawyer working for the police and then immediately advised defendant of his rights. Defendant indicated that he understood each of those rights and that he was willing to give a statement. Accordingly, Mondello sat with him and drafted one. She denied writing the statement based on what O'Leary told her.

Mondello testified that the statement was taken on a form used by the State's Attorney's office. At the top of this form are defendant's preprinted rights and then a space for the statement. Mondello stated that she did not use a yellow pad to take down defendant's statement. Mondello stated that defendant read aloud the rights written on the form and then she read his statement to him. Defendant's signature appears at the top of the handwritten statement, under the preprinted rights section and also at the bottom of each page of the statement.

After reading the statement to defendant, she told him that if there was anything he wanted changed he should tell her.

Mondello testified that defendant never indicated that he was beaten or was denied the use of bathroom facilities. She never left the room between the time she took the statement and when defendant signed it. She did not notice any bruises or discoloring of defendant's face. Defendant told her that he received food while at the station and that he indeed shot the victim. At the close of the evidence, the court denied defendant's motion.

The trial began on March 14, 1989. Duane Sammons, nicknamed Cratches, testified that on September 24, 1987, cocaine was being sold from apartment No. 214 at 6241 North Kenmore. Sammons stated that the victim had lived in that apartment in the past. He identified defendant and stated that defendant was living there on September 24, 1987. Around 7 p.m. that evening, Sammons was at his girl friend's house on Kenmore when Earl-16 came over. Earl-16 told Sammons to go down to Birmingham's apartment to get some beer. When Sammons got to the apartment, defendant answered the door pointing a chrome gun at him. Sammons told defendant to put the gun down and defendant put it to his side. Sammons told defendant that Earl-16 sent him for some beers. Peter, who was also in the apartment, gave Sammons some beers. Defendant was clutching the gun the whole time. Sammons denied ever telling defendant that Earl-16 shot the victim and testified that he did not learn of the shooting until the next day.

Following the testimony of several occurrence witnesses, Mondello read defendant's statement to the jury. In his statement, defendant said that he was at apartment No. 214 on September 24, 1987, when Earl-16 came over that evening. Defendant agreed to buy beer for him and he accepted money from Earl-16 and Peter. Just before defendant left, the victim arrived at the apartment and followed defendant into the hallway. The victim started to insult defendant. Defendant went back into the apartment and got a gun from Peter. Defendant went into the hallway and pointed the gun at the victim; the victim ran. Defendant chased him into the stairwell and up the stairs. Defendant grabbed the back of the victim's shirt and he fell. Defendant pointed the gun at his head and shot him once. Defendant took the gun back to the apartment and went to buy beer. Defendant returned with the beer. Earl-16 was gone; Cratches came by later and picked up some beer. Defendant and Peter then went to another apartment in the building where they waited until the police left. Defendant and Peter then went to stay at a friend's house. Defendant said the victim never had a gun. Defendant also stated he was well treated by the police and was not threatened or made any

promises. He stated he was given food, cigarettes and drinks and was allowed to use the bathroom. Mondello testified that defendant was not handcuffed and never complained of any injuries.

Defendant testified at trial that on September 24, 1987, he was on the south side of Chicago. Garfield Birmingham offered him a ride home but took defendant to the north side of Chicago instead. They arrived at apartment No. 214 at around 2 p.m. Defendant sat around the apartment until Birmingham returned. Later that evening, defendant went to the store to purchase beer. When he returned, only Peter was present. Defendant left the apartment around 8 p.m. and went home. Defendant denied shooting anyone.

Defendant also testified about his treatment by the police. While his testimony is similar to his previous testimony, several inconsistencies can be noted. At trial, defendant stated that Thezan told Mondello what to write down but at the hearing he said that O'Leary told her what to write. Second, defendant stated at the hearing he was struck in the right eye while at trial he said he was struck in the left. Third, at trial defendant stated that O'Leary was the one who beat him yet at the hearing stated that it was Kajari who beat him.

In rebuttal, Carlos Martinez and Dr. Aaron Hamb testified as they did before. Officers Kajari, O'Leary and Thezan testified about defendant's treatment and that there were no garbage cans in the interview room.

Following closing arguments, defendant was found guilty of murder and sentenced to 25 years' imprisonment. Defendant brings this appeal.

Defendant first contends that his admissions to the police should have been suppressed because they were the fruit of an illegal arrest. Defendant asserts that the existence of an arrest is demonstrated by the length of his stay and by the facts that the police placed him in an interrogation room, left him there for long durations, questioned defendant on numerous occasions, and never told him that he was not under arrest or free to leave at any time. Defendant notes that no probable cause existed to support his detention. The State responds that the length of defendant's stay and the other circumstances to which defendant cites reflect that he was an informant cooperating with the police in a potentially dangerous murder investigation.

When determining whether an arrest has been made, courts focus on the intent of the police officers and the understanding of the individual being questioned at the time he is detained. (*People v. Wipfler* (1977), 68 Ill. 2d 158, 368 N.E.2d 870; *People v. Johnson* (1989), 187 Ill. App. 3d 756, 544 N.E.2d 392.) In assessing the officer's intent, the court will consider whether there was any formal declaration of arrest and

whether other routine procedures associated with an arrest were present, such as searching, booking, handcuffing, fingerprinting and photographing. (*Johnson*, 187 Ill. App. 3d at 769, 544 N.E.2d at 400.) In assessing the understanding of the individual being questioned, the court is not concerned with what the particular individual thought; rather, the court is concerned with whether a reasonable person, innocent of any crime, would have concluded he was not free to leave in similar circumstances. (*Johnson*, 187 Ill. App. 3d at 769, 544 N.E.2d at 400.) A reviewing court will not overturn a trial court's denial of a motion to quash arrest unless it is manifestly erroneous. *Johnson*, 187 Ill. App. 3d at 770, 495 N.E.2d at 400.

■ In this case, we believe the circuit court's denial of defendant's motion to suppress was not manifestly erroneous. Defendant's entire case rests on his testimony that he was kept against his will. This testimony was contradicted by all the State's witnesses. More importantly, a review of defendant's testimony reveals that he was not the most credible witness. During cross-examination, defendant's testimony became convoluted and conflicting. At the end of cross-examination at the suppression hearing and at trial, no redirect was attempted. Defendant's lack of credibility must have weighed heavily against him with the judge and jury.

Aside from defendant's lack of credibility, evidence exists to support the State's assertion on appeal that the police treated defendant as an informant who was cooperating with the police in a potentially dangerous investigation and who remained at police headquarters for those 48 hours for his protection. The evidence further supports that defendant believed himself to be acting in such a capacity.

Garfield Birmingham, who was cooperating with the police, gave information which led the police to defendant's residence. There, the officers asked defendant to accompany them to Area Six headquarters. Defendant agreed. During the next 48 hours, the evidence showed that defendant voluntarily assisted the police. He was never handcuffed, searched, booked, or fingerprinted and he never received his *Miranda* rights prior to interviews or subjected to other procedures indicative of arrest.

Defendant, on numerous occasions, gave police information which they attempted to verify. This information included key investigatory facts such as the location of the murder weapon and the whereabouts of individuals potentially involved. On one occasion, defendant accompanied the officers to the residence of Earl-16. Earl-16 did in fact live in that building but was not home at the time. Defendant's own testimony reflects that he went upstairs with the two detectives and

waited to the side with one of them while the other detective knocked on the door. On the return trip to headquarters, defendant testified he was allowed to purchase food at a gas station outside the presence of the police. Defendant testified at the hearing that he did not run away from the police because he was trying to "assist" them. We find that the above evidence is more reflective of a defendant cooperating with the police than one who is the subject of a murder investigation.

Defendant in his brief puts great emphasis on his 48-hour stay at police headquarters. Defendant cites numerous cases where lengthy stays and continual questioning have been found improper in the absence of probable cause. (See *Dunaway v. New York* (1979), 442 U.S. 200, 60 L. Ed. 2d 824, 99 S. Ct. 2248; *People v. Townes* (1982), 91 Ill. 2d 32, 435 N.E.2d 103, *cert. denied* (1982), 459 U.S. 878, 74 L. Ed. 2d 143, 103 S. Ct. 174; *People v. Travis* (1984), 122 Ill. App. 3d 671, 462 N.E.2d 654; *People v. Fitzpatrick* (1982), 107 Ill. App. 3d 876, 438 N.E.2d 222; *People v. Sturdivant* (1981), 99 Ill. App. 3d 370, 425 N.E.2d 1046.) These cases are distinguishable; unlike the present case, no testimony existed in those cases to reflect a defendant who was cooperating with the police in an ongoing and dangerous murder investigation.

Based on the evidence presented, the circuit court was entitled to find that over the course of 48 hours defendant provided information to the police which led to the discovery of other individuals. The detectives testified that defendant did not want these other individuals to know of his cooperation. The police, therefore, kept him secluded from these persons while the investigation continued. Only when these individuals gave versions of the night's events which conflicted with defendant's did defendant come under police scrutiny as a suspect. Defendant was then read his rights, elected to waive those rights, and thereafter made the confession in question.

For these reasons, we believe it was not manifestly erroneous for the circuit court to hold that defendant was not subjected to an illegal arrest.

Defendant next contends that his statements should have been suppressed on the grounds that they were involuntary. The State responds that the evidence demonstrates that defendant's statements were voluntary.

The State bears the burden of establishing by a preponderance of the evidence that a confession is voluntary. (*People v. Caballero* (1983), 102 Ill. 2d 23, 33, 464 N.E.2d 223, 227, *cert. denied* (1984), 469 U.S. 963, 83 L. Ed. 2d 298, 105 S. Ct. 362; *People v. Mackey* (1990), 207 Ill. App. 3d 839, 859, 566 N.E.2d 449, 462.) In making

this determination, courts utilize the test of whether, considering the totality of the circumstances, the confession is found to have been made freely and voluntarily and without compulsion (*Mackey*, 207 Ill. App. 3d at 859-60, 566 N.E.2d at 462, citing *People v. Prude* (1977), 66 Ill. 2d 470, 363 N.E.2d 371, *cert. denied* (1977), 434 U.S. 930, 54 L. Ed. 2d 291, 98 S. Ct. 418), or whether defendant's will was overborne at the time he confessed so as not to be the product of rational intellect and free will. (*Mackey*, 207 Ill. App. 3d at 860, 566 N.E.2d at 462, citing *Townsend v. Sain* (1963), 372 U.S. 293, 9 L. Ed. 2d 770, 83 S. Ct. 745; *People v. O'Leary* (1970), 45 Ill. 2d 122, 257 N.E.2d 112.) A reviewing court will not disturb the trial court's determination in this regard unless it is against the manifest weight of the evidence (*Caballero*, 102 Ill. 2d at 33, 464 N.E.2d at 227-28; *People v. Payton* (1984), 122 Ill. App. 3d 1030, 1033, 462 N.E.2d 543, 545), and the court may consider the evidence heard by the trial court at the suppression hearing and at trial when evaluating the voluntariness of the confession. *Caballero*, 102 Ill. 2d at 35-36, 464 N.E.2d at 229.

■ In this case, the evidence demonstrates that defendant's statements were voluntary. At a minimum, under the applicable standard of review, the circuit court's determination is not against the manifest weight of the evidence.

According to the police, defendant was not given food the night he was brought in because it was already 8 p.m. and defendant made no request for food. The next day, after visiting Earl-16's residence, defendant testified that, at around noon or 1 p.m., he was allowed to purchase a candy bar and a 7-Up. Later that evening, he was given a Big-Mac and a 7-Up. The next day, September 27, defendant was again given food. Consistent with this evidence is defendant's own statement, read at trial, that he was provided food.

As for defendant's allegation of physical abuse and denial of washroom facilities, defendant's testimony is contradicted by that given by the various police officers, Assistant State's Attorney Mondello and Carlos Martinez. Defendant's own statement alleged that he was never beaten and was indeed provided washroom facilities. No evidence exits that defendant was denied the opportunity to sleep. Moreover, the physical injuries to which Carlos Martinez and Dr. Aaron Hamb testified do not necessarily support defendant's claimed version of his treatment. Martinez specifically asked defendant if he had any physical complaints or problems; defendant responded negatively. Martinez also failed to observe any physical signs of mistreatment which would support defendant's claim of frequent and harsh beatings.

The question of the voluntariness of defendant's statements became one of balancing the credibility of the various witnesses. Defendant's testimony was contradicted by numerous State witnesses and lacked clear, objective support. Moreover, defendant's credibility was called into issue in light of the numerous inconsistencies between his trial testimony and that given at the hearing. Given this court's inability to substitute its judgment for that of the circuit court, and the manifest weight of the evidence supporting the court's finding of voluntariness, we reject defendant's claim that his admissions were involuntary.

Turning now to defendant's final contention, defendant claims that he was denied a fair trial when the State argued in closing argument that Duane Sammons, or Cratches, consistently told the same story to the police and, therefore, was a more credible witness.

■ We dispose of this contention on the grounds of waiver. Defendant neither objected to the State's comments during closing argument nor specifically mentioned this error in his post-trial motion. The alleged error is, therefore, waived. (*People v. Enoch* (1988), 122 Ill. 2d 176, 522 N.E.2d 1124, *cert. denied* (1988), 488 U.S. 917, 102 L. Ed. 2d 263, 109 S. Ct. 274.) Moreover, the plain error exception does not require this court to consider the issue. The evidence in this case is not closely balanced, and the alleged error is not of such magnitude as to deprive defendant of a fair trial. For these reasons, we deem defendant's argument waived.

For the foregoing reasons, the judgment of the circuit court of Cook County is affirmed.

Affirmed.

CAMPBELL and O'CONNOR, JJ., concur.