THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. MICHAEL MASON, Defendant-Appellant.

First District (6th Division)   No. 1—93—2648

Opinion filed August 4, 1995.

Rita A. Fry, Public Defender, of Chicago (Cheryl K. Lipton, Assistant Public Defender, of counsel), for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb, William D.

Carroll and James S. Beligratis, Assistant State's Attorneys, of counsel), for the People.

JUSTICE ZWICK delivered the opinion of the court:

Defendant, Michael Mason, was convicted following a jury trial of first degree murder and subsequently sentenced to a term of 40 years in the penitentiary. He now appeals his conviction, raising the following issues for our review: (1) whether the trial court committed error in denying his motion to quash his arrest and suppress evidence; (2) whether the admission of certain gang evidence was irrelevant and prejudicial; (3) whether the State was permitted to admit improper evidence of polygraph examinations taken by defendant; (4) whether comments made by the prosecutor during closing arguments were inflammatory and improper; and (5) whether his sentence was excessive.

Defendant was convicted of shooting Charles Hayes at approximately 11 p.m. on the night of April 25, 1990, at 57th and Winchester, in Chicago. When police arrived at the scene, Hayes was still alive and lying under a parked automobile. Hayes later died from his injuries. Because the defendant was seen with the victim shortly before he was shot, police surmised that he could have been a witness to the crime and searched the neighborhood in an effort to find him. Both Hayes and the defendant were members of the same street gang, the Gangster Disciples. After finding defendant with Joe Kidd in the late morning hours of April 26, 1990, police transported defendant to Area Three police headquarters for questioning. At Area Three, defendant ultimately confessed to shooting Hayes at the direction of Dan Wesson, a ranking member of the Gangster Disciples.

Defendant first argues that the trial court improperly denied his motion to quash his arrest and suppress evidence of his statements to police. Defendant claimed that he was arrested on the street by police and that, at this time, police did not have probable cause to detain him. Following a hearing on defendant's motion, the trial court ruled that the defendant voluntarily accompanied police to the police station on April 26, 1990, and that defendant did not become a suspect in the murder investigation until much later, when his statements to the police indicated he may have actually taken part in the murder. Although the court indicated it was troubled by the fact that defendant had remained in the stationhouse for nearly 48 hours before being placed under arrest, the court found that defendant's fear of retaliation from members of his own gang for his cooperation with police was the basis for his voluntarily staying in the safety of the stationhouse.

As we have noted, evidence presented at the hearing indicated that police had information the defendant was present on the street shortly before Hayes was shot. Officers James O'Brien, Fred McKinley and Norfie Diciola testified they located defendant at Joe Kidd's house and that defendant voluntarily agreed to go to Area Three to assist them in their investigation of the shooting. Once at the police station, defendant told detectives that Dan Wesson was the shooter and that Terry Williams and Joe Kidd were also present. Although the detectives were able to locate Williams and Kidd, they were unsuccessful in their efforts to locate Wesson, whom they intended to arrest. During this time, defendant indicated he was afraid of Wesson and that he did not wish to leave the station until after officers had taken Wesson into custody.

When defendant was informed by police, following their follow-up investigation, that they could not find anyone to verify his story, defendant volunteered to take a polygraph examination. Upon taking and failing the polygraph examination the next day, defendant changed his story, stating that it was Williams, and not Wesson, who was the shooter.

The police subsequently interviewed Williams, who denied involvement. Williams also agreed to take a polygraph examination. After Williams passed the examination and after defendant was told this fact, defendant stated that he wanted to take the test again. Upon being informed that he had failed the second test, defendant changed his story again, stating that Wesson had told him to bring a gun to a gang meeting in Gage Park on the day of the shooting. Defendant stated that he gave a gun to Williams at this meeting. Defendant told police that he, Wesson and Hayes were still at the meeting at the time of the shooting, but that Williams had left 30 minutes earlier with the gun. He then insisted on speaking with Detective McKinley.

After meeting with McKinley, defendant changed his story yet again, this time confessing to shooting Hayes. Assistant State's Attorney Pamela Hughes was present during a subsequent court-reported statement in which defendant stated that he was afraid of Dan Wesson because Wesson had threatened to kill him if he did not "ice" Hayes. Although Wesson, Hayes, Williams and the defendant were all Gangster Disciples, Wesson was upset with Hayes for having lost a weapon to the police which had been used in a previous murder. Wesson was concerned that Hayes would become an informer for the State. Defendant told Assistant State's Attorney Hughes that he had come to the police station voluntarily and denied that he had been threatened by police.

It is settled law that a reviewing court will not overturn a trial court's ruling on a motion to quash an arrest and suppress evidence unless the trial court's ruling is "manifestly erroneous." (*People v. Adams* (1989), 131 Ill. 2d 387, 400, 546 N.E.2d 561.) "Manifestly erroneous" or "against the manifest weight of the evidence" occurs where the trial court's ruling is " 'palpably erroneous and wholly unwarranted' or 'arbitrary, unreasonable, and not based upon the evidence.' " (*People v. Leach* (1993), 245 Ill. App. 3d 644, 655, 612 N.E.2d 825, quoting *People v. Shelby* (1991), 221 Ill. App. 3d 1028, 1039, 582 N.E.2d 1281.) It is the function of the trial court to weigh the evidence, determine the credibility of the witnesses, and to resolve any conflict in their testimony. *People v. Redd* (1990), 135 Ill. 2d 252, 268, 553 N.E.2d 316, 322.

■ The trial court, in ruling on the motion, made specific findings that defendant's witness, Joe Kidd, was not credible. The trial court stated that credible evidence adduced at the hearing established that defendant voluntarily accompanied the police to the station at their invitation. The trial court stated that probable cause to arrest defendant began to evolve as the lie detector tests were being administered to defendant and the results were such as to create questions as to his veracity. As to the issue of whether defendant remained at the police station voluntarily, the trial court discussed its findings as follows:

> "[A]t no time prior to the time that sufficient probable cause to arrest the Defendant had evolved, at no time did the Defendant request permission to leave that facility.
>
> At no time did he indicate a desire to leave the facility and at no time did the police officers do anything to discourage him in making that request.
>
> I find that under the circumstances in this case that the credible evidence establishes that the defendant continually and even in his final statement expressed fears that [he] would be associated with the police were he to be allowed—were he to leave the police facility, and I believe it is that fear, as established in this hearing that had kept him there without any request to leave. Therefore, the Motion[s] *** will be denied."

In light of the conflicting testimony in this case and in light of the court's specific findings, we cannot conclude that the court's ruling was manifestly erroneous. The trial court clearly believed the State's version of events over the testimony of the defendant and of Joe Kidd. On these facts, we cannot conclude that the trial court's findings were either arbitrary or unreasonable. See *People v. Perez* (1992), 225 Ill. App. 3d 54, 587 N.E.2d 501 (affirming denial of motion to quash arrest and suppress evidence on similar facts).

Defendant next asserts that the State, during the presentation of its case, improperly put into evidence irrelevant testimony regarding Chicago's street gangs, which the defendant claims was highly inflammatory. Defendant claims that the cumulative and prejudicial effect of this gang testimony necessarily undermined the ability of the jury to fairly consider the issues presented.

Defendant first argues that police officer Thomas McMahon should not have been allowed to testify as to elements of gang life which had no bearing on the issues of the case. In his testimony, Officer McMahon described in detail various Chicago gangs and their affiliations under two large national organizations, the Folks and the People. The State presented evidence that the victim and the defendant were each members of the Gangster Disciples, a gang affiliated with the Folks. A review of Officer McMahon's testimony reveals the following information:

(1) there exist two umbrella organizations of street gangs in Chicago, the Folks and the People;

(2) the Folks orient their hats and other items of clothing to the right while the People orient their clothing to the left;

(3) the Folks' graffiti tends to have a six-pointed star on it, while the Peoples' graffiti has a five-pointed star;

(4) there are currently 41 major active gangs in Illinois including the Milwaukee Kings, Satan Disciples, Maniac Latin Disciples, Ashland Vikings, Black Gangster Disciples, C-Notes, Campbell Boys, Imperial Gangsters, Spanish Cobras and Latin Dragons, which are affiliated as Folks, while other gangs such as the Latin Kings, Black Peace Stone Nation, El Rukns, Spanish Lords, and Insane Unknown are affiliated with the People;

(5) the Folks and People are enemies;

(6) there is intra-gang fighting between the Black Gangster Disciples Nation so that they now call themselves the Gangster Disciples;

(7) "representing" means to use verbal or nonverbal manifestations of gang membership, such as wearing certain clothing, jewelry and using certain hand signs;

(8) Gangster Disciples flash their hand signs, a pitchfork made from two fingers, over the right shoulder;

(9) the Gangster Disciples' colors are black and blue;

(10) one can show disrespect to a rival gang by flashing signs or putting graffiti upside down;

(11) graffiti is used to mark gang territory;

(12) tattoos of gang signs or logos identify individuals as gang members and provide a sense of belonging;

(13) Folks gang members say "all is well," "all is one," or "what's up, Folks";

(14) Jerome King and Shorty Freeman are the top leaders of the Black Disciples;

(15) Larry Hoover is the "king" of the Black Gangster Disciples;

(16) Gangster Disciples are national;

(17) every penitentiary has a gang member who "rules" the penitentiary;

(18) under King Hoover, in descending order, are the chairmen of the board, coordinators, governors, then regents (or regions) and the lowest level of gang membership, the shortys or workers;

(19) shortys are members who are young, new recruits;

(20) shortys are called upon to do shootings because they fall under the juvenile justice system;

(21) regents control narcotics trafficking within their territories;

(22) regents hire workers who sell drugs and work security for drug sales, and who keep weapons in their homes;

(23) Gangster Disciples are trying to legitimize themselves by becoming a Political Action Committee which they call "growth and development"; and

(24) regents tell workers where to stand on corners to sell drugs.

■ The State responds by claiming defendant failed to object to this testimony during trial and in his post-trial motion, thereby waiving his claims that he was prejudiced by the admission of this evidence. It is well settled that a defendant may not claim trial error unless he objects to its admission both before the trial court and in a written post-trial motion. (*People v. Enoch* (1988), 122 Ill. 2d 176, 186, 522 N.E.2d 1124.) Our review of the record, however, indicates that defendant did object to the admission of this type of testimony both in an *in limine* motion filed prior to trial and then again in a written post-trial motion. The court denied both motions. Although we recognize that there are a number of appellate court cases which have required a party to contemporaneously object when evidence is offered even if that party has filed a motion *in limine* on the matter which has been denied (see, *e.g., Cunningham v. Millers General Insurance Co.* (1992), 227 Ill. App. 3d 201, 206, 591 N.E.2d 80), our supreme court has held that a defendant preserves an issue for appeal by either raising the issue in a motion *in limine* or objecting at trial and also raising the issue in a post-trial motion. (*People v. Hudson* (1993), 157 Ill. 2d 401, 434-35, 626 N.E.2d 161; *People v. Boclair* (1989), 129 Ill. 2d 458, 476, 544 N.E.2d 715.) Here, defendant preserved this issue when he raised it both in his motion *in limine* and in his post-trial motion. We therefore conclude that defendant

did not waive the issue by failing to make a contemporaneous objection.

With regard to the merits of defendant's claims, we agree that the State was improperly permitted to put into evidence testimony which was both irrelevant and inflammatory. Relevant evidence is evidence which tends to prove or disprove a disputed fact or render the matter in issue more or less probable. (*People v. Johnson* (1991), 215 Ill. App. 3d 713, 731, 575 N.E.2d 1247.) The State argues that the defendant's affiliation with the Gangster Disciples gang was relevant to show defendant's motive for killing Hayes. The State's theory of the case, however, was that the defendant and the victim were members of the *same gang*. While the organizational structure of the Gangster Disciples was relevant to the State's case in order to demonstrate defendant's possible motive for shooting Hayes, facts about gang rivalries, presentment, graffiti, tattoos, and drug sales clearly do not go to defendant's motive.

■ We also find error in the trial court's refusal to redact a large portion of defendant's stenographed confession. As part of defendant's motion *in limine*, defendant asked the trial court to redact much of defendant's typed responses to questions put to him during his confession. The motion was denied, with only a minor modification to the confession with regard to defendant's involvement in selling cocaine. Defendant stated in his confession:

(1) the Gangster Disciples is a large gang, covering a large part of Chicago;

(2) the gang has divided the city into specific territories;

(3) Larry Hoover is the "king" of the Gangster Disciples, including areas beyond Chicago;

(4) a man named "Billy" or "DeLude" is the Gangster Disciples' coordinator for Chicago, providing security;

(5) at the meeting in Gage Park, Wesson, Williams, Hayes and the defendant discussed "mak[ing] a more powerful mob" by initiating contact with all the Folks in Chicago and by improving "growth and development";

(6) the enemies of the Gangster Disciples in Chicago were the rival gangs, the P-Stone, Vice Lords and Mickey Cobras;

(7) Gangster Disciples "represent" by wearing their hats to the right, earring in the right ear or two earrings on the right, one in the left; and

(8) Gangster Disciples signal each other by flashing hand signs in the form of pitchforks.

Once again, we are at a loss to understand how this evidence was probative of the issues properly before the jury. We find this evidence

to have been irrelevant and prejudicial and conclude that it should have been excluded.

■ Similarly, we find error in the State's use of testimony regarding defendant's status as a "regent" in the Gangster Disciples. Defendant complains that the State put into evidence that a regent is a gang member responsible for selling drugs, protecting drug territories and for hiring workers who are responsible for hiding guns at the regent's direction. The State argues that this regent testimony did not prejudice the defendant because it "did not specifically apply to defendant and did not tie defendant to any specific crimes." Nonetheless, we do not agree with the State that, because no specific crimes were referred to by the State, this testimony was not "other crimes evidence." Testimony that defendant was a regent and that regents are responsible for selling drugs and hiding weapons has the same tendency to inflame the jurors' passions as testimony that defendant, in fact, sold drugs or hid weapons. Testimony regarding the general duties of a regent within the Gangster Disciples should have been excluded as it was both prejudicial and irrelevant.[1]

■ We also find error in the State's use of photographs of the defendant which show him to be tattooed with gang symbols such as a pitchfork, a six-pointed star and with the word "Midnight." Again, the issue at trial was not whether the defendant was a member of the Gangster Disciples. This fact was conceded by defense counsel during opening statements. While the State correctly argues that it had the right to put into evidence the fact that the defendant was a Gangster Disciple in order to demonstrate motive, in our view too much emphasis was placed on the defendant's tattoos, particularly by the State during its closing argument. Instead of arguing that the tattoos on defendant's body established that he was a member of a street gang, which would have been proper, the prosecutor used the tattoos as evidence that defendant was proud of his gang membership.

■ Finally, we cannot conclude that the admission of irrelevant gang evidence in this case was harmless error. Joe Kidd testified that he saw the defendant just minutes after the shooting and that defendant was crying and stated, "They shot my cousin," referring to

---

[1]Testimony that regents are responsible for hiding weapons might have been relevant to the State's case, if the State had established that the person on whom Hayes was expected to turn was a regent or if it had been established that Hayes himself was a regent. As we have noted, the State theorized that Hayes was shot because he had lost a weapon. The State's evidence at trial, however, indicated that Hayes was a worker and that the person on whom he was expected to turn was a governor, not a regent.

Hayes. Defendant's counsel argued in closing that the evidence presented by the State suggested that Dan Wesson had committed the murder, as defendant initially claimed when he was transported to the police station. According to the defendant's arguments, defendant agreed to help the police with the case against Wesson initially, but confessed to the crime himself only after it became clear that Wesson might be able to evade the police and that defendant might never be able to safely return home. While this line of argument is not without its weaknesses, the fact that excessive gang evidence had been admitted brings into serious question whether the jury fairly considered the defendant's claims. Because we find that the fairness of defendant's trial was compromised by the State's introduction of irrelevant, inflammatory and excessive gang testimony, we reverse defendant's conviction and remand for further proceedings.

In light of our disposition, we need not address defendant's arguments regarding the State's closing arguments and defendant's sentencing. We elect, however, to address defendant's claim that improper polygraph evidence was admitted against him, as the issue is likely to recur on remand.

Defendant, in an *in limine* motion, sought to bar the State from admitting any evidence that the defendant submitted to two polygraph examinations during the time he was with the police. The trial court, in ruling on the motion, held that the State could make reference to the fact that defendant had been transported to police headquarters at 11th and State to speak with "personnel" at that location, but that there was to be no mention of the fact that the defendant had taken polygraph examinations or of the results of the polygraph tests.

Illinois courts have repeatedly and consistently held that the results of polygraph examinations may not be admitted into evidence to establish the guilt or innocence of the defendant. (*People v. Gard* (1994), 158 Ill. 2d 191, 201, 632 N.E.2d 1026; *People v. Melock* (1992), 149 Ill. 2d 423, 459, 599 N.E.2d 941; *People v. Taylor* (1984), 101 Ill. 2d 377, 391-92, 462 N.E.2d 478; *People v. Baynes* (1981), 88 Ill. 2d 225, 244, 430 N.E.2d 1070.) The State argues that it abided by the trial judge's order and points out that the words "polygraph" and "lie detector" were never used during the course of the trial. We conclude, however, that the State violated the spirit, if not the letter, of the court's order and put before the jury improper evidence that defendant had failed polygraph examinations.

Starting with its opening statement, the prosecution introduced evidence that defendant went to 11th and State to talk to a laboratory "technician" at the Chicago police crime laboratory. The prosecutor told the jury that Terry Williams was also taken to talk with this

same person after he had been taken into custody. The prosecutor told the jury that defendant went back a second time to speak with this lab technician. During the State's case, four different witnesses referred to the fact that defendant was taken to 11th and State to speak with a "technician" or "examiner." Assistant State's Attorney Hughes testified that, when defendant returned to Area Three from his trip to 11th and State and was "given the results of those conversations," he then changed his story.

During closing argument the prosecutor argued:

> "They go out and try to corroborate and try to verify [defendant's story], and what do they find out? Michael, we can't corroborate your story. All right, well then I want to go down to 11th and State and talk to a technician down there. All right, we'll do that. And they take him down there.

* * *

> They take him down to 11th and State and he talks to a technician and lo and behold, he changed his story."

■ Even though the prosecutor and witnesses never said the words "polygraph" and "lie detector," the State successfully signalled to the jury that the defendant had failed a polygraph examination. As the defendant has argued, jurors are sufficiently knowledgeable through their exposure to crime dramas and to news sources that police sometimes use polygraph examinations to assist them in their investigations. While the State must be allowed to account for the defendant's conduct at the stationhouse during the time he spent there, the trial court and the State on remand must take special care in not exposing the jury to what is improper testimony or argument regarding defendant's polygraph examinations. On remand, the State must not refer to the fact that defendant was "examined" by a "technician" or that he changed his story after being confronted with "results." The admission of such testimony poses the risk of denying defendant a fair trial.[2]

For the foregoing reasons, defendant's conviction is reversed and the cause remanded for further proceedings consistent with this opinion.

Reversed and remanded with directions.

McNAMARA, P.J., and EGAN, J., concur.

---

[2]Our opinion today in no way restricts the trial court's authority should the defendant elect to testify on remand and challenge the reliability of his confession. In such a case, the supreme court's opinion in *Melock* provides the guidelines the court should follow regarding the circumstances surrounding defendant's polygraph examinations.