**NONPRECEDENTIAL DISPOSITION**

To be cited only in accordance with
Fed. R. App. P. 32.1

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois 60604**

Argued April 25, 2012
Decided May 14, 2012

**Before**

RICHARD A. POSNER, *Circuit Judge*

DIANE S. SYKES, *Circuit Judge*

JOHN DANIEL TINDER, *Circuit Judge*

| | |
|---|---|
| No. 11-1433 | Appeal from the |
| | United States District Court |
| PIERRE JAMES, | for the Northern District of Illinois, |
| *Petitioner-Appellant*, | Eastern Division. |
| | |
| *v.* | No. 09 C 7490 |
| | |
| MARCUS HARDY,* | William T. Hart, |
| *Respondent-Appellee*. | *Judge.* |

**O R D E R**

Pierre James, a member of the Gangster Disciples, was tried and convicted of murdering Cory Boston, who James believed was a member of the Black Disciples. At trial three eyewitnesses identified James as the shooter, but James's alibi witnesses—the heart of his defense—never made it to court. In this appeal from the district court's denial of his petition for a writ of habeas corpus, James argues that he would not have been convicted

---

*James has been transferred from Menard Correctional Center to Stateville Correctional Center. We have substituted the Warden at Stateville as the Respondent-Appellee.

but for his lawyer's ineffective assistance—specifically, her failure to tell his alibi witnesses to be in court that morning at 10:45. Because James's lawyer acted reasonably when she told the witnesses to arrive by noon, we affirm the judgment.

This case arises from a 1998 "war" between two factions of the Black Disciples and Gangster Disciples. The two gangs—sometimes rivals, sometimes allies—originated in Chicago and briefly merged in the late 1960s to form the Black Gangster Disciple Nation before splitting back into the Gangster Disciples and Black Disciples. *See, e.g.*, *United States v. Irwin*, 149 F.3d 565, 567 (7th Cir. 1998); *People v. Williams*, 753 N.E.2d 1089, 1101 (Ill. App. Ct. 2001); *People v. Mason*, 653 N.E.2d 1371, 1374–75 (Ill. App. Ct. 1995); *see also* Susan Chandler, *Gangs Built On Corporate Mentality*, CHI. TRIBUNE, June 13, 2004, *available at* http://articles.chicagotribune.com/2004-06-13/business/0406130224_1_gangster-disciples-gang-members-black-disciples.

The theory of the prosecution was that James shot Boston to avenge an earlier beating. The earlier beating was in response to James's attempt to murder Robert Williams, a different Black Disciple. Williams testified at trial that about a month before the murder, James attempted to shoot Williams, saying, "This is for my Folks, guy." ("Folks" is a gang nickname for fellow Gangster Disciples. *See Mason*, 653 N.E.2d at 1374–75.) James's gun jammed, and Williams fled. James and fellow Gangster Disciple Willie Bishop chased Williams, but crashed their car into a church. While James sat unconscious in the front seat, Bishop fled and a group of Black Disciples converged on the car and beat James about the head and face until police arrived. No witness identified Boston as a Black Disciple, but the prosecution's theory was that James *believed* Boston was one of the Black Disciples who had beaten him up.

Three eyewitnesses testified that about a month after the beating, in the dead of night, James, Bishop, and a third person spotted Boston sitting in a parked car and shot him to death. The eyewitnesses were Ed Calmes, who saw the shooting from his nearby front porch; Tyrice Jones, a former Gangster Disciple who was sitting in a car parked up the street from Boston; and Marvin Dixon, a reputed Black Disciple who was placing a tarp over his girlfriend's car, which was parked up the street from Jones. All three men identified James in court as one of the shooters. Dixon also testified that James confessed to the murder while they were in jail together and offered to shoot the witnesses in Dixon's own pending attempted-murder case if Dixon agreed not to testify against him. A fourth eyewitness, Pierre Martin, a Gangster Disciple, testified for the defense that he was present but did not see the killers.

James has always maintained his innocence, and part of his defense was given in the

testimony of two alibi witnesses. According to their sworn affidavits in support of James's petition for post-conviction review in the Illinois courts, Tracy Poulos and her daughter Rena Williams would have testified that James spent the entire night of the murder in the basement of their house in Riverdale (about six miles from the shooting) asleep on the couch beside his girlfriend.

The jury never heard these alibi witnesses because they arrived at court too late on the day they were supposed to be called to testify. Though the witnesses had waited at the courthouse the entire previous day, the prosecution's case went overlong and was still not finished when court adjourned. On the fifth and final day, trial was scheduled to begin at 10:45 a.m., and the court told the state's witnesses to arrive no later than 11 a.m. The court repeatedly admonished all counsel to be ready at 10:45 a.m. so that the court could get the case to the jury "reasonably early." James's counsel advised his alibi witnesses that they need not arrive until noon.

The witnesses left for court from Riverdale between noon and 12:30 p.m., later than instructed by trial counsel, but still well before the defense anticipated calling them. (The defense rested at 3:17 p.m.) The drive from Riverdale to the Cook County courthouse takes over 30 minutes at the best of times, but on that day the Dan Ryan Expressway became impassible when shortly after 1:30 p.m., state police closed the southbound lanes in response to a shooting. *See* CHI. TRIBUNE, DAN RYAN GUNFIRE INJURES MAN IN CAR, Oct. 20, 2001, *available at* http://articles.chicagotribune.com/2001-10-20/news/0110200158 _1_southbound-lanes-christ-hospital-chicago-man. Although the witnesses were in the northbound lanes, they were caught in a gawker's delay as other drivers slowed down to view the scene and backed up traffic behind them.

No one at the courthouse knew why the alibi witnesses had not arrived. Shortly after 2 p.m., the court granted a recess to give the witnesses more time to appear, but when court reconvened at 3:15 p.m., the witnesses still were not there. The court denied James's request for a second recess, and thus at 3:17 p.m. the defense rested because it had no remaining witnesses. Although the alibi witnesses arrived minutes later (approximately 3:30 p.m.), their appearance was not brought to the court's attention until after closing arguments were concluded and the jury had been sent to deliberate.

The jury convicted James of first-degree murder, and the court sentenced him to forty years' imprisonment. On direct appeal, James argued (among other things) that his trial counsel was ineffective for failing to instruct his alibi witnesses to arrive before court reconvened at 10:45 a.m. The appellate court affirmed his conviction without commenting on his ineffective-assistance-of-counsel claim, *People v. James*, 810 N.E.2d 96, 103 (Ill. App. Ct. 2004), and the Illinois Supreme Court declined review. After unsuccessful

post-conviction review in the Illinois courts, James petitioned the federal district court for a writ of habeas corpus, arguing once again that his attorney's ineffective assistance deprived him of a defense.

The district court first addressed the standard of review: When a state court has adjudicated a habeas claim on the merits, 28 U.S.C. § 2254(d) requires federal courts to grant great deference to that decision. But the district court decided that § 2254(d) did not apply because the Illinois appellate court issued an opinion that did not mention James's ineffective-assistance-of-counsel claim. Although the Illinois court ruled that the absence of the alibi witnesses did not prejudice James, it did so in the context of James's claim that the trial court abused its discretion when refusing to grant a second continuance. The abuse-of-discretion standard requires deference to the trial court, whereas an ineffective-assistance-of-counsel claim is reviewed de novo. Accordingly, the district court held that it could not construe the Illinois court's ruling on the continuance claim as a ruling on the ineffective-assistance-of-counsel claim and, instead, reviewed James's ineffective-assistance claim de novo.

Nonetheless, the district court denied the petition because it found that James could not show a reasonable probability that his alibi witnesses would have swayed the jury. The court held that a reasonable jury would have doubted the alibi witnesses but not the eyewitnesses. Because the court considered the issue to be a close one, it granted James a certificate of appealability.

To prevail on his ineffective-assistance-of-counsel claim, James must show a reasonable probability that but for his counsel's deficient performance, the result of his trial would have been different. *Strickland v. Washington*, 466 U.S. 668, 694 (1984). We review the district court's denial of a writ of habeas corpus de novo. *See Lewis v. Sternes*, 390 F.3d 1019, 1025 (7th Cir 2004). The district court presumed that trial counsel was ineffective because the state did not contest the issue in district court; James has not pressed a waiver argument on appeal. *See United States v. Burton*, 441 F.3d 509, 513 (7th Cir. 2006) (Rovner, J., concurring); *United States v. Mansoori*, 304 F.3d 635, 663 n.11 (7th Cir. 2002). Because the Illinois court did not adjudicate the question of counsel's performance, we review that question de novo. *See Porter v. McCollum*, 130 S. Ct. 447, 452 (2009); *Wiggins v. Smith*, 539 U.S. 510, 534 (2003); *Steffes v. Pollard*, 663 F.3d 276, 281–82 (7th Cir. 2011); *Sussman v. Jenkins*, 642 F.3d 532, 534 (7th Cir. 2011).

James argues that his counsel was ineffective because her instruction to his alibi witnesses that they need not arrive at court until noon placed "witness convenience above the vital interests of [her] client." *Washington v. Smith*, 219 F.3d 620, 630 (7th Cir. 2000).

James relies on cases in which trial counsel made no effort or only a minimal effort to produce alibi witnesses. *See, e.g.*, *Raygoza v. Hulick*, 474 F.3d 958, 963–65 (7th Cir. 2007); *Washington*, 219 F.3d at 629–30. Unlike the attorneys in *Raygoza* and *Washington*, James's trial counsel did not neglect her duty to obtain the alibi witnesses. She successfully procured their presence for trial—they were at the courthouse for the entire previous day, and when the prosecution's case ran long, she told them to report back the next day. She simply advised them that they would not be needed until the afternoon session because the prosecution's case was ongoing. She could not have foreseen that they would leave their home late, much less that a man would be shot on the Dan Ryan Expressway at the precise time that the witnesses were trying to reach the court. Had they left home in the morning with sufficient time to arrive by noon—as instructed by counsel—they would have arrived in time to testify in accordance with the court's trial schedule.

James argues that the importance of these witnesses rendered trial counsel's direction to them unreasonable. It was the final day of trial, and the court explicitly stated its desire to get the case to the jury as quickly as possible that day. Because the two alibi witnesses were the centerpiece of James's defense, he argues, even a noon deadline was insufficiently cautious in light of the court's time constraints. But counsel had good reason to expect that the witnesses would arrive on time; they had appeared for court the previous day without incident, and there was no reason to think that they would not return by noon the next day as she instructed. As the state's attorney argued in the hearing on James's motion for a new trial: "Those witnesses chose to do what they did on that day." Their independent decision to depart for court late does not render trial counsel's conduct unreasonable.

Because counsel's performance was not constitutionally deficient, we need not decide whether there is a reasonable probability that the testimony of the alibi witnesses would have affected the verdict. Accordingly, we **AFFIRM** the judgment of the district court.