THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiffs-Appellees, v. JOSE BARAJAS, Defendant-Appellant.

First District (2nd Division)    No. 1—99—2365

Opinion filed May 15, 2001.—Rehearing denied June 11, 2001.

542

Michael J. Pelletier and Ann C. McCallister, both of State Appellate Defender's Office, of Chicago, for appellant.

Richard A. Devine, State's Attorney, of Chicago (Renee Goldfarb, Jon J.

Walters, and Alvin S. Ratana, Assistant State's Attorneys, of counsel), for the People.

JUSTICE COUSINS delivered the opinion of the court:

Defendant-appellant, Jose Barajas, was convicted of first degree murder and two counts of aggravated discharge of a firearm. He was sentenced to 34 years' imprisonment for first degree murder and 4 years' imprisonment for each count of aggravated discharge of a firearm, to be served consecutively. Defendant presents the following issues upon appeal: (1) whether the trial court erred in allowing a Chicago police officer to testify as a gang expert regarding gang hierarchy, territory, rivalries, gang rules, and drug sales; and (2) whether his sentences for first degree murder and aggravated discharge of a firearm should be modified to run concurrently.

We affirm in part and vacate in part.

## BACKGROUND

At defendant's jury trial, Anna Torres testified for the State that on September 27, 1995, at about 1 p.m., she observed a four-door vehicle traveling on Washtenaw with a grey vehicle following closely behind it. In the second vehicle, Torres noticed one person in the driver's seat and two passengers in the backseat. As the cars approached the intersection of Washtenaw and Cortland, Torres heard four shots coming from the second car. She heard shots being fired by the passenger sitting behind the driver in the second car. Torres testified that she recognized the shooter, and in court, she identified the defendant as the shooter. During cross-examination, Torres stated that she recognized the driver of the second car as a man who was known as Bull.

Darrell Johnson testified for the State that in 1995, he was a member of the Maniac Latin Disciples street gang. He testified that he did not remember whether the Maniac Latin Disciples were at odds with any other gangs in September 1995. He also testified that he knew the victim, Eric Givens, because they grew up together and he was a good friend of his in 1995. Johnson testified that Givens was a member of the Maniac Latin Disciples and that Givens' nickname was Bull. He further testified that Astol Arroyo went by the name of Lurch.

During direct examination, Johnson was shown a picture of a grey Cadillac. The State asked, "[D]o you remember back in September of 1995 being in the car when some shots were fired?" Johnson responded, "No." The State further inquired, "You don't remember at all? *** Total memory lapse of the month of September of '95?" Johnson responded, "Yes." Then the State asked whether Johnson was with Givens when he was shot. Johnson stated that he did not

remember being in the vehicle, who was in the vehicle, who shot Givens, who took Givens to the hospital, or any other details of the day Givens was shot. Johnson could not recall looking through photographs or indicating that one them was a photograph of the shooter. He could not recall testifying before the grand jury. He was shown a statement that he gave at Area 5 police station on June 7, 1997, in which he implicated defendant as the shooter. He acknowledged that his signature appeared on each page. He could not recall whether the assistant State's Attorney read the statement to him or whether he made corrections or signed each page. He could not recall providing the information contained in the statement. He testified that he did not know whether "folks" have a rule that gangs under that umbrella do not testify against other "folks." He testified that he did not know what a "violation" was.

Astol Arroyo testified for the State that he was a member of the Maniac Latin Disciples gang in September 1995. Arroyo testified that on September 27, 1995, at about 12:50 p.m, he was riding around in a grey Cadillac with Darrell Johnson and Eric Givens in the area of Washtenaw and Cortland. Arroyo was driving and Darrell Johnson was in the passenger seat next to him. Eric Givens was in the backseat, directly behind Arroyo. Arroyo testified that as he was driving, he noticed a grey car on the east side of Washtenaw on Cortland. He stated that he stopped at the stop sign on Cortland and as he crossed Cortland, he slid his head out of the car and saw a "machine gun, little [U]zi, whatever it was, it was not a handgun" coming out of the backseat, on the driver's side of the other car. He stated that after he heard the first shot, he "hit the gas pedal and took off." Arroyo testified that he only noticed a driver and the shooter occupying the other vehicle, but denied seeing their faces. He did not hear anyone from the other car yell anything. He heard between seven and nine shots fired. Arroyo testified that Givens told him to drive to the hospital because he had been shot. Arroyo also testified that he spoke with a Chicago police officer at the hospital.

Arroyo stated that on October 4, 1995, a week after the shooting, he spoke with Detective Wojcik about the shooting. Arroyo denied telling Wojcik that he recognized the shooter as a member of the Latin Lovers gang or that he asked the detective to keep his identity confidential for as long as possible.

The State inquired about the written statement signed by Arroyo on June 7, 1997, regarding the events of the September 27, 1995, shooting. Arroyo testified that when he arrived at Area 5 violent crimes headquarters on June 7, 1997, Assistant State's Attorney Lorraine Scaduto had a statement already written up for him to sign regarding

the events on September 27, 1995. He stated that he read it to make sure it did not incriminate him and then he signed it. He denied ever speaking to Scaduto prior to her submitting it to him for his signature. Arroyo also testified that in July 1997 he was present before a grand jury.

Arroyo further testified that in September 1995 the Latin Lovers and Maniac Latin Disciples were at war "at times." He also stated that he was aware that, about 10 hours before the shooting of Eric Givens, a Latin Lover named Floco had been murdered. He testified that he was not aware of any gang rule that said that "folks don't testify against folks." He testified that "a violation is when you get beat up" by other members of the gang.

On cross-examination, Arroyo testified that he went to the police station with officers on the day of the shooting and viewed approximately two photo books, but he did not identify anyone as the shooter because he did not have a clear view of the shooter. The day before Givens' burial, Arroyo was brought to the police station for traffic violations. He stated that Detective Wojcik used threats and promises to force him to identify defendant's photo as the shooter.

Assistant State's Attorney Lorraine Scaduto testified for the State that on June 7, 1997, she was called to assist detectives at Area 5 regarding the investigation of a homicide that occurred on September 27, 1995. Scaduto testified that Arroyo gave her a statement dated June 7, 1997, regarding the shooting and that she explained to him that his statement would be memorialized and he would have the opportunity to make any additions, changes or corrections to that statement once it was written. Scaduto also stated that Darrell Johnson gave her a statement dated June 7, 1997, regarding the murder of Givens. Scaduto published Johnson's and Arroyo's statements to the jury. Johnson's statement provided, in pertinent part:

> "Darrell Johnson states that on September 27, 1995, at about 12:50 p.m. he was in Eric Givens' car with Eric and Astol Arroyo. Darrell Johnson states that as they were approaching Washtenaw he saw a grey car driving west on Cortland. *** Darrell Johnson states that he heard someone from the grey car yell out something and that Bull told Lurch to stop the car. *** Darrell Johnson states that Bull thought maybe the guy in the grey car was a customer, but that when Darrell looked at the guy he recognized him to be a member of the Latin Lovers street gang, which Darrell states were Maniac Latin Disciple's rivals at that time. Darrell Johnson states that in September 1995 there was a war between the two gangs because a 'D' killed a Lover. Darrell Johnson states that 'D' is short for Maniac Latin Disciples. Darrell Johnson stated that he

saw the Latin Lover point a large black gun at Bull's car from the driver's side of the car he was in[.] Darrell Johnson state[s] that he told Lurch to drive away when he saw the gun. Darrell Johnson states that he had a clear view of the Latin Lover's face at this time and saw him shoot the gun one time. *** Darrell Johnson states that Bull said he had been hit so Lurch and Darrell took him to the hospital. Darrell Johnson states that he does not know the Latin Lover who shot Bull by name but he knows his face because he has seen him many times in the neighborhood."

Arroyo's statement provided, in pertinent part:

"Astol Arroyo states that on September 27, 1995 he was with Eric Givens and Darrell Johnson in Eric Givens' car. *** Astol Arroyo states as he turned right on Wabansia he saw a grey car driving west on Cortland. Astol Arroyo states that as he made the turn Bull said, 'Stop— there's a customer.' *** Astol Arroyo states that he saw a guy in the car looking out, leaning on the door. Astol Arroyo states that the guy said 'Disciple killers mother fuckers.' *** Astol Arroyo states that he recognized the guy as a Latin Lover from California and Milwaukee. *** Astol Arroyo states that in September 1995, the Lovers and the Maniac Latin Disciples were rivals and at war, so when he saw the Lover at Cortland and Wabansia acting bold and disrespectful, he thought he might have a gun. *** Astol Arroyo states that Dee told him 'Go—he's got a gun.' *** Astol Arroyo states that Bull yelled out that he got hit so he and Dee took Bull to the hospital."

The State called Assistant State's Attorney Kevin Golden. Golden interviewed Arroyo on July 8, 1997. Golden stated that Arroyo agreed to go before the grand jury. Golden also interviewed Darrell Johnson on September 9, 1997. Golden stated that, during this interview, Johnson agreed to testify before the grand jury. Golden then published the transcript of Johnson's grand jury testimony. Johnson's grand jury testimony includes the following pertinent parts:

"Q. And what did that [other] car do?
A. They said something out of the car.

* * *

Q. Do you know what those people—do you know what they said?
A. No.
Q. What happened then?
A. Bull opened the door, and I looked back and I saw a guy that I know which was a Latin Lover.

* * *

Q. And the guy you knew, where was he at in the other vehicle?
A. He was driving.
Q. Do you recall what his name is?

A. Negro.

* * *

Q. Now, in 1995 were the Latin Lovers and the Maniac Latin Disciples, were they getting along at that time?

A. No.

Q. Were they at war?

A. Yes.

* * *

Q. When you saw Negro in the driver's seat of that car, what happened next?

A. I told him to pull off.

Q. You told who to?

A. Lurch to pull off.

Q. What happened then?

A. He came out with a gun and started shooting.

Q. Who came out with a gun?

A. Negro.

* * *

Q. Now, the individual you identified as Negro, had you seen him prior to the shooting?

A. Yes.

Q. Where did you see him at?

A. Milwaukee and California.

Q. Is that where he was a member of the Latin Lovers, from that neighborhood?

A. Yes.

Q. And had you seen him numerous times prior to that?

A. Yes."

Assistant State's Attorney Golden testified to pertinent parts of Arroyo's grand jury testimony:

"MR. GOLDEN [Assistant State's Attorney]: I am showing you what has been previously marked as People's exhibit B for identification, do you recognize that person?

MR. ARROYO [witness]: Yes, I do.

Q. Who is that person?

A. The guy that was hanging out the window.

Q. And you had seen him prior to this?

A. Yes.

Q. Do you know what neighborhood he is from?

A. From Milwaukee and California.

Q. He was a Latin Lover from that area?

A. Yes."

The State called Officer John Souchet to testify. Officer Souchet's testimony established that on August 18, 1997, at approximately 11 p.m., he made a traffic stop at 2317 North Milwaukee. One of the as-

sisting officers, Officer Rodriguez, observed that one of the passengers was the defendant and stated that she believed he was wanted for a homicide case. Souchet stated that the defendant was arrested. It was stipulated that the warrant for his arrest was issued on July 12, 1997.

Officer Gina Rodriguez testified that on August 18, 1997, she observed the occupants of a vehicle stopped by Officer Souchet. She recognized the defendant and told Officer Souchet that defendant was wanted for a homicide.

Detective Thomas Shebish testified that on September 27, 1995, he went to St. Elizabeth Hospital to investigate a report of a man shot. He met Astol Arroyo in the waiting room of the hospital. While at the hospital, Detective Shebish viewed the entire vehicle in which Givens was shot. Shebish indicated that it was a grey Cadillac. He observed a bullet hole in the trunk, a hole in the backseat, and blood on the seat and floor. On cross-examination, Shebish testified that Arroyo provided him with a description of the offenders and the vehicle driven by the offenders.

Defense counsel made a motion *in limine* outside of the presence of the jury to limit Officer Cesar Echeverria's anticipated testimony regarding statements made to him by the defendant on September 26, 1995, as Echeverria searched for the weapon used in the murder of the defendant's friend, Floco. While the judge did not decide this issue, the State submitted that it would "lead the detective in that area so he doesn't make that statement. *** Only thing he can testify the defendant voiced his anger at Disciples as was stated in the police report." The judge asked defense counsel if she had "any problem with that." Defense counsel stated that she did not.

Also during that hearing, the trial judge inquired as to Echeverria's basis for his anticipated testimony that the defendant was a member of a gang. The judge stated, "All I want to get to the point about what is the basis for him to say that Mr. Barajas is a member of the gang." Officer Echeverria responded, "He is a self admitted. He's told me many times." The court also asked, "How many times in that 6 year period have you been in contact with Mr. Barajas?" Echeverria stated, "Numerous times. *** [A]s doing the police work, investigating just gangs." The following was also stated during the hearing:

> "THE COURT: So, as far as I am concerned this Officer is qualified to identify Mr. Barajas as a self admitted member of this gang. *** Any further act of Mr. Barajas walking along with him, things like that, Court has no problem with him, if you can qualify him [as an] expert.
>
> MR. GALIVAN [Assistant State's Attorney]: As well as higherarchy [*sic*], gang rules.

THE COURT: Please let's not turn this into a seminar on gangs. Let's get to the issues that are necessary.

MS. COLLINS [defense attorney]: Judge, I would agree with that. I would like to know how far, exactly how far they are going to go with this.

THE COURT: Well, as far as the Court is concerned the Officer has experience. If he can be qualified as [an] expert on gangs, he can testify about what his knowledge about [what a] gang violation is, what the basis for [a] gang violation would be.

MR. GALIVAN: Higherarchy [sic], territory, rivalries.

THE COURT: Territory in question. The rival gangs in question, I will allow that."

Officer Cesar Echeverria testified that he had been a member of the Chicago police department gang tactical unit for approximately eight years. He had been qualified to testify in court as a gang expert on two previous occasions. The State then tendered the witness for cross-examination on his qualifications as a gang expert. After cross-examination, defense counsel, in a sidebar, objected to Echeverria being characterized as a gang expert, reasoning that "his qualifications are [not] close to being expert witness qualifications."

During direct examination, Officer Echeverria testified that when the gang tactical unit gathers gang intelligence, they conduct "surveillance, numerous interviews with self admitted gang members from different gangs. We speak to citizens. Speak to other police officers. Any form of intelligence we can gather on gangs and their members." After the State inquired as to Echeverria's work history in the 14th District and his familiarity with the gangs in that area, the judge found that Officer Echeverria was an "expert in the area of gangs regarding the 14th district, the particular areas of California and Milwaukee and Talman and Wabansia." Echeverria's testimony included the following:

"People and folks are the 2 factions that are broken into the gangs in the city.

\* \* \*

Gang higherarchy [sic] is mainly how the system is set up as far as leader, one leader which the gang calls a chief. This is the person who will get out orders, mainly in charge of receiving any money for narcotics. He and through him he assigns different leaders to the corners. Their names are governors.

Chief can you know assign, so and so you take this corner. You will be governor of that corner. And put them out there to sell narcotics. Whatever money is made, some of it is given to that corner to that leader and the rest of the money is given to the chief."

The State then asked, "And all gang members are not necessarily involved in the sale of narcotics, is that correct?" Officer Echeverria responded, "Correct." Echeverria then continued:

"Lowest wrung of the ladder would just be a foot soldier, someone hangs out there, who is assigned to do security for one hour, carry the gun.

And even something lower than that would be the shorties, which are kids that are too young to join the gang."

Following are additional questions and answers:

"Q. Would you tell the ladies and gentlemen of the jury what some of the rules of the gangs are?

A. Some of the rules of the gang as far as taking narcotics, only narcotics they are able to take are cannabis, marijuana.

If they are caught taking any sort of cocaine or anything else, they will be dealt with.

Q. Now, are there rules regarding respect toward other gang members?

A. Yes. For the most part folks will respect people and people will respect folks. Folks respect people or people respect folks.

Q. Officer Echeverria, do the gangs have rules regarding cooperation with the police in the investigation of criminal activity?

A. Yes, they do. *** The rule is that you don't cooperate with the police. *** That is called tricking or you are called a trick. And you don't want to be called a trick because you will be disciplined. *** They have a violation which is the way a gang holds violation is they set up whoever the governor is, even the chief can set up [a] certain amount of time, 2 minutes, 5 minutes, 7 minutes. They will form [a] line with the members of your own gang, whoever the trick is, put him in there, beat him for that certain amount of time by his own gang members. And that is accepted by the gang members once they join. If they get violation, they have to go through with it.

Q. And could a gang member be violated for tricking?

A. Yes.

Q. Is testifying in court against another gang member considered tricking to the gang?

A. Very much so.

Q. Do some of your intelligence gathering activities involve interviews of people who have already been incarcerated, for example, in the Cook County Jail?

A. Yes."

Echeverria also testified that gang alliances are maintained behind prison walls and "once you are in jail you have to belong to either folks or people just to survive. Because in jail it is separated just be-

tween folks or people. *** It is totally different than what happens on the street."

He further testified that he was familiar with the gangs known as the Maniac Latin Disciples and the Latin Lovers within the 14th District. The house located at 2319 North California Avenue was the home of Latin Lovers gang members and was frequented by gang members from that area. Based on his numerous conversations with the defendant, he knew that defendant was a member of the Latin Lovers and his street name was Negro.

On the evening of September 26, 1995, at approximately 10:30 p.m., Echeverria was called to 2319 North California in response to a shooting. He knew that the victim, who was known as Floco, was a member of the Latin Lovers gang. The witnesses present, including the defendant, gave him descriptions of the alleged shooters. The two alleged shooters were members of the Maniac Latin Disciples. While he searched for the gun used in the shooting, the defendant walked with him the entire time. The State asked, "Officer, did the defendant express to you or voice his anger at the Maniac Latin Disciples while you [were] out there looking for the gun?" Echeverria responded, "Yes." During the cross-examination of Echeverria, defense counsel made a motion for mistrial as a result of Echeverria revealing the statement made to him while searching for the weapon used to shoot Floco. The motion for mistrial was denied.

Detective Wojcik testified that on October 4, 1995, he spoke with Astol Arroyo regarding the events of September 27, 1995, at Area 5. He stated that Arroyo told him the sequence of events leading up to the shooting, that the vehicle carrying the shooter was a grey Toyota, that he recognized an occupant of the car as a Latin Lover, and he heard that person yell, "Disciple Killer mother fucker." Wojcik testified that Arroyo also gave the following description of the suspect: "male Mexican, approximately 21 to 25 years of age, about 5 foot 5 inches tall, dark complexion, black hair, long black hair, with a long tail in the back." Arroyo was shown a photo book of over 120 Latin Lovers and he identified one as the person he saw and heard yell the earlier mentioned statement. Wojcik further testified that Arroyo told him that his cooperation with police was going against gang rules but, after seeing Givens' family at the funeral, he thought that they would suffer less if they knew that the person who killed Givens was caught.

Detective Wojcik also testified that on June 7, 1997, he transferred Arroyo from the Cook County jail to Area 5. While at Area 5, Arroyo was allowed to call his family and to visit with his infant daughter and girlfriend in an interview room for about 10 minutes with the door open. Wojcik stated that the during the entire visit, he or his partners

could see into the interview room. On July 8, 1997, Arroyo was brought to Area 5 and spoke with Wojcik. Wojcik denied that he promised Arroyo another visit with his infant daughter on July 8, 1997.

Detective Hector Vergara testified that he interviewed the defendant on August 18, 1997. He testified that the defendant told him that, on the day of the shooting, he was on the corner of Milwaukee and California. Vergara testified that the defendant told him that he was no longer a member of the Latin Lovers gang and went to Mexico after the burial of his friend Floco because his father was sick and possibly dying. Vergara stated that defendant also told him that on the afternoon of September 27, 1995, he was at his girlfriend's house until approximately 10 p.m.

The State called Dr. Barry Lifshultz, a staff forensic pathologist of the Cook County medical examiner's office, to testify. Dr. Lifshultz testified that he conducted the autopsy of Eric Givens and observed a gunshot wound entrance on the left side of Givens' back. The bullet traveled through Givens' lung and heart and rested in the right chest wall.

The State proceeded by way of stipulation of testimony by a firearms examiner and expert. It was the examiner's opinion that the bullet retrieved from Givens' body came from a .38-caliber handgun.

Detective Ronald Koncz testified for the defense that he interviewed Anna Torres and she gave him a description of the shooter. The defense then rested its case in chief.

The jury found defendant guilty of first degree murder and two counts of aggravated discharge of a firearm. The defense filed a motion for new trial, which was denied. Defendant now appeals.

## ANALYSIS

### I

Defendant contends that he was denied a fair trial by the admission of testimony regarding gang hierarchy, drug sales, gang rules, and violations. Defendant further contends that such testimony by Officer Echeverria was inflammatory, irrelevant, and invaded the jury's province by bolstering the credibility of prior inconsistent statements made by Johnson and Arroyo.

■ The admission of expert testimony is within the sound discretion of the trial court, and the court's decision will not be reversed on appeal absent an abuse of discretion. *People v. Eyler*, 133 Ill. 2d 173, 212, 549 N.E.2d 268 (1989). A defendant may not claim trial error unless he objects to its admission both before the trial court and in a written posttrial motion. *People v. Enoch*, 122 Ill. 2d 176, 186, 522 N.E.2d 1124 (1988). A motion for a new trial must specify the grounds

therefor. 725 ILCS 5/116—1 (West 1994). However, a defendant may preserve an issue for appeal by either raising the issue in a motion *in limine* or objecting at trial and also raising the issue in a posttrial motion. *People v. Hudson*, 157 Ill. 2d 401, 434-35, 626 N.E.2d 161 (1993).

■ The State contends that the defendant's claim that the testimony of Officer Echeverria denied him a fair trial is waived because, although defendant objected to Officer Echeverria testifying as an expert, he made no clear objection to Echeverria's anticipated testimony at trial and he failed to raise the argument alleging the irrelevance or inflammatory nature of the testimony in his motion for a new trial. Relative to defendant's posttrial motion, the defendant, in that motion stated, in pertinent part:

> "6. The Court erred in allowing Chicago Police Officer Ceasar Echivierria [*sic*] [to] testify as an expert witness.
>
> 7. The Court erred in allowing Officer Echivierra [*sic*] to testify as to the ultimate issue that the defendant was a member of the Latin Lovers street gang."

In the instant case, the trial court was apprised that the State intended to adduce testimony from Officer Echeverria regarding gang territory, hierarchy, rules, and violations and the court indicated that the officer could testify about these matters if he was qualified as a gang expert. After Officer Echeverria testified regarding his qualifications, the defendant objected. The court found Echeverria to be a gang expert in the 14th District. The defendant's objection to Echeverria's testimony while the court was considering his qualification to testify in specified areas as a gang expert, together with the posttrial motion stating that the court erred in allowing Echeverria's testimony as an expert witness, adequately preserved this issue for review.

■ Generally, a police officer's testimony regarding gang activity is proper when the officer's testimony qualifies as expert opinion, the testimony is relevant, and the prejudicial effect of the opinion does not outweigh its probative value. See *People v. Jackson*, 145 Ill. App. 3d 626, 633-35, 495 N.E.2d 1207 (1986). In Illinois, an individual will be permitted to testify as an expert if the witness's experience and qualifications afford the witness knowledge that is not common to lay persons and where such testimony will aid the trier of fact in reaching its conclusion. *People v. Enis*, 139 Ill. 2d 264, 288, 564 N.E.2d 1155 (1990).

■ In the instant case, Echeverria's testimony was based on over eight years of interviewing citizens, gang members, and police officers. His testimony provided information regarding the Maniac Latin Disciples and the Latin Lovers in the 14th District. His testimony also provided relevant information regarding gang hierarchy, rules, and

violations. The trial court did not abuse its discretion in allowing Echeverria to testify as an expert.

The defendant's reliance on *People v. Mason*, 274 Ill. App. 3d 715, 653 N.E.2d 1371 (1995), to support his contention that Officer Echeverria's testimony was irrelevant, inflammatory, prejudicial, and denied him a fair trial is misplaced. A salient difference between *Mason* and the instant case is that, in *Mason*, the defendant and the victim were members of the same gang, while the defendant and the victim in the instant case were members of rival gangs that were at war. In *Mason*, the testimony of a police officer included: the names of the two umbrella organizations of street gangs in Chicago; the names of active gangs in Illinois; how members signify their affiliation through clothing, hand signs, verbal manifestations, graffiti and tattoos; how one shows disrespect to a rival gang; the names of Hoover, King, and other top gang leaders; and a statement that the Gangster Disciples gang is "trying to legitimize themselves by becoming a Political Action Committee which they call 'growth and development.' " *Mason*, 274 Ill. App. 3d at 720-21. Defendant also asked the trial court, in its motion *in limine*, to redact portions of his confession which included a report on a meeting in Gage Park between the defendant and other named persons where the defendant discussed "mak[ing] a more powerful mob." *Mason*, 274 Ill. App. 3d at 722. The *Mason* court, in holding that the State was improperly permitted to put into evidence testimony that was both irrelevant and inflammatory, reasoned that "[w]hile the organizational structure of the [gang] was relevant to the State's case in order to demonstrate defendant's possible motive for shooting [the victim], facts about gang rivalries, presentment, graffiti, tattoos, and drug sales clearly do not go to defendant's motive." *Mason*, 274 Ill. App. 3d at 722. Relative to the motion *in limine* to redact portions of the defendant's confession, the *Mason* court also held that the trial court erred in denying that motion because the evidence was irrelevant and prejudicial. *Mason*, 274 Ill. App. 3d at 722.

In the instant case, the testimony of Officer Echeverria is similar in some areas to the testimony of the witness in *Mason*. However, the motives in the cases are dissimilar because, here, unlike in *Mason*, the victim and the defendant are not members of the same gang. Also, in the instant case, the testimony of Officer Echeverria and other witnesses establishes that, at the time of the shooting, the victim and the defendant's gangs were at "war." Additionally, in *Mason*, the testimony regarding specifically named gang leaders and the gang's attempt to "legitimize" itself is an example of irrelevant and inflammatory testimony that is not present in the instant case.

In our view, testimony in the instant case by Echeverria regarding

drug sales and use in the instant case exceeds the areas that the trial court had specified as authorized for Echeverria's expert testimony. Echeverria's references to drugs were erroneous, albeit nonresponsive to the State's questions. A follow-up question by the State, "And all gang members are not necessarily involved in the sale of narcotics, is that correct?," together with Echeverria's response, was probably asked to offset Echeverria's nonresponsive answer. We do not agree with the State's contention on appeal that the witness's reference to narcotics was proper testimony because it explained Johnson's and Arroyo's statements that, immediately prior to the shooting, they thought that the defendant was a "customer." Here, however, in the context of other evidence, any error was harmless.

■ Defendant also contends that the testimony of Officer Echeverria was improperly used by the State to bolster the prior statements made by State witnesses. The State responds that Echeverria's testimony concerning gang rules and alliances in prison was properly admitted to explain why Darrell Johnson and Astol Arroyo identified defendant as the shooter prior to trial but did not do so at trial.

Defendant relies on *People v. Simpkins*, 297 Ill. App. 3d 668, 697 N.E.2d 302 (1998), to support his contention that Echeverria's testimony impinged on the province of the jury to determine witness credibility. *Simpkins*, however, is distinguishable from the instant case. In *Simpkins*, the defendant argued that the trial court erred by allowing a child protective services investigator to testify about the frequency with which child victims of sexual abuse recant and the reasons for such recantation. The court reasoned that the witness was being asked to give his opinion on the believability of the child witness. *Simpkins*, 297 Ill. App. 3d at 683. In the instant case, Echeverria provided testimony from which the trier of fact could make inferences. However, he did not opine that the witnesses, Johnson and Arroyo, were not credible.

Defendant also relies on *People v. Howard*, 305 Ill. App. 3d 300, 712 N.E.2d 380 (1999) (a psychologist testified about battered woman syndrome). In *Howard*, the court held that the psychologist's testimony that there was no evidence that the witness tried to deceive her during her evaluation impinged upon the province of the jury to determine credibility and assess the facts of the case. *Howard*, 305 Ill. App. 3d at 308. Again, in the instant case, there is no testimony by Echeverria that impinged on the province of the jury by stating his opinion on the credibility of any of the State's witnesses.

The State cites *People v. Williams*, 262 Ill. App. 3d 734, 635 N.E.2d 781 (1994), and *People v. Rainge*, 211 Ill. App. 3d 432, 570 N.E.2d 431 (1991). In *Williams*, unlike the instant case, the witness himself testi-

fied that he was forced to move since his involvement in the case, that his younger brother's life had been threatened, that he had been offered money for testimony favorable to the defendant, and that he was afraid even as he testified. *Williams*, 262 Ill. App. 3d at 743. In *Rainge*, as in *Williams*, the witness himself testified as to his fear and actual threats made toward him or his family. *Rainge*, 211 Ill. App. 3d at 448.

While we recognize that testimony from the State's witnesses that they feared for their own and their family's safety is properly admitted when used to illustrate why the witness had given inconsistent statements (*Williams*, 262 Ill. App. 3d at 743), neither *Williams* nor *Rainge* is apposite because, in the instant case, there was no testimony from Arroyo or Johnson that they had been threatened, subjected to a violation, or even afraid for their own safety as a result of testifying.

The State also posits that Officer Echeverria's testimony was relevant to establish a motive for the shooting and to explain the testimony by witnesses at trial. The State relies on *People v. Carson*, 238 Ill. App. 3d 457, 606 N.E.2d 363 (1992), in which the defendant argued that the trial court erred in allowing the testimony of a police officer regarding a gang rivalry at the time of the murder in that case. The expert gang testimony in *Carson* is significantly more limited than the expert testimony in the instant case. However, "gang-related evidence will not necessarily be excluded if it is otherwise relevant and admissible." *Carson*, 238 Ill. App. 3d at 464. In the instant case, as in *Carson*, we hold that the trial court did not abuse its discretion in allowing Officer Echeverria to testify as an expert witness as the evidence was relevant and the probative value of the testimony outweighed the possible prejudice to the defendant. *Carson*, 238 Ill. App. 3d at 465.

## II

Defendant's next major contention is that, pursuant to *People v. Whitney*, 188 Ill. 2d 91, 720 N.E.2d 225 (1999), his consecutive sentences for first degree murder and aggravated discharge of a firearm should be modified to run concurrently. The State has conceded this point.

■ In *Whitney*, the Illinois Supreme Court held that a consecutive sentence is required "where the defendant has been convicted of either a Class X or Class 1 felony and where he had inflicted severe bodily injury during the commission of that felony." *Whitney*, 188 Ill. 2d at 98-99. In the instant case, the defendant was convicted of first degree murder and two counts of aggravated discharge of a firearm. First degree murder is not a Class X or Class 1 felony; it is its own class of felony. 730 ILCS 5/5—5—1(b) (West 1994); see *Whitney*, 188

Ill. 2d at 100. Aggravated discharge of a firearm is a Class 1 felony. 720 ILCS 5/24—1.2(a)(2), (b) (West 1994). The offenses here occurred as a part of a single course of conduct in which there was no substantial change in the nature of the criminal objective. However, the two counts of aggravated discharge did not result in severe bodily harm to the victims of those felonies. Therefore, since the Class 1 felonies in the instant case did not involve the infliction of severe bodily harm to the victims of those felonies, mandatory consecutive sentences are not provided for under section 5—8—4(a) of the Illinois Unified Code of Corrections. 730 ILCS 5/5—8—4(a) (West 1994).

Accordingly, it is hereby ordered that the consecutive sentences for aggravated discharge of a firearm be modified to run concurrently with the sentence for first degree murder. This cause is remanded to the trial court for the issuance of a new mittimus.

Affirmed in part and modified in part; cause remanded with directions.

CAHILL, P.J., and McBRIDE, J., concur.