FIFTH DIVISION
June 30, 2010

No. 1-08-2266

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | 06 CR 18135 |
| | ) | |
| RAUL GOMEZ, | ) | The Honorable |
| | ) | Lawrence P. Fox, |
| Defendant-Appellant. | ) | Judge Presiding. |

PRESIDING JUSTICE TOOMIN delivered the opinion of the court:

We are called upon to determine whether the trial court's *in limine* ruling curtailed defendant's ability to corroborate his claim of self-defense through his former girlfriend. Defendant maintains the ruling, allowing introduction of defendant's alleged threat on her life if she testified at variance with her grand jury testimony, effectively precluded him from calling her and furthering his defensive strategy.

Following a jury trial, defendant, Raul Gomez was convicted of first degree murder and attempted first degree murder and sentenced to consecutive terms of 50 and 40 years' imprisonment, respectively. Defendant now appeals contending the trial court erred by: (1) denying defendant's motion *in limine* seeking to limit cross-examination of a defense witness; (2) allowing the introduction of his prior conviction; (3) refusing to instruct the jury on his provocation-passion theory of second degree murder; and (4) limiting the scope of the direct examination of the defendant. For the reasons that follow, we affirm.

BACKGROUND

Defendant, Raul Gomez was charged by indictment with first degree murder, attempted first degree murder, aggravated battery with a firearm, and unlawful use of a weapon by a felon. The charges stemmed from an occurrence wherein Rafael Trujillo was fatally shot and Luis Aguirre sustained nonfatal gunshot wounds. Defendant was tried before a jury and convicted of first degree murder and attempted first degree murder. He was then sentenced to 50 years' imprisonment for murder and a consecutive term of 40 years' imprisonment for attempted first degree murder. Defendant does not challenge the sufficiency of the evidence or the sentence imposed. Consequently, we review only those facts necessary to understand and analyze the issues presented.

In October 2005, Luis Aguirre lived at 6217 South Talman in Chicago, Illinois. Though the surrounding neighborhood was traditionally quiet, during the summer of 2005 changes occurred. Aguirre attributed them significantly to his neighbor's son inviting young people over to congregate and drink on his property and adjoining residences. On several occasions, Aguirre complained to his neighbor, Pedro "Guero" Troncoso, who was in his mid- to late teens, asking that he keep his friends off of Aguirre's porch. The Troncosos lived in the house immediately to the south of the Aguirres. After Aguirre approached Troncoso about this issue, the problem temporarily abated, but reappeared when Greg Harris, who lived next door to the north, told Aguirre that people were hanging out on Aguirre's porch in his absence. According to Aguirre, bottles were left in his bushes and in between his house and Harris's house. Additionally, Troncoso's visitors would urinate "all over the place. I couldn't even sit in the front of my house

because of the flies." The problem continued.

On October 8, 2005, Aguirre and his close friend, Rafael Trujillo, attended a birthday party in Schaumburg, Illinois. Trujillo drove them in his Durango. They consumed approximately six or seven beers over about two to three hours at the party. En route home, they stopped at an establishment where Aguirre's cousin worked and drank a "couple" more beers. Aguirre testified that he was "buzzed," but not stumbling. He denied Trujillo, a physically larger man, was drunk.

They returned to Aguirre's home around 1:40 a.m. on October, 9. Eventually, Trujillo double-parked in front of Aguirre's house. Trujillo exited the car, leaving the keys inside with the engine running. Aguirre observed a number of people congregating on his porch, Troncoso's porch, and around the area. He was upset and angered by the scene and began yelling for Guero, to no avail.

Aguirre saw a number of unknown males and females gathered around his stairs and porch, "Laughing, drinking, getting loud." Beer bottles were "everywhere." He recalled:

> "I was a little upset, and I told them to get the - - I told them to get the fuck off my property, that I didn't want them there. I told them, I kept screaming for Guero, because I knew those were his friends, so I told them to get the fuck out of here, and I was just pretty loud with them."

Thereafter, Aguirre returned to Trujillo's car to retrieve the keys because he was concerned someone would try to take the vehicle.

As he was yelling and swearing at the group, they began coming down the stairs. Defendant, whom Aguirre had never seen before, walked up to Aguirre and stared at him.

Defendant asked if Aguirre knew who he was. In response, Aguirre asked defendant his name and what his problem was and told him to get off the property. In turn, defendant uttered something that Aguirre was unable to understand.

Aguirre then heard someone running through the gangway between his home and the Troncosos' home. Defendant turned toward the gangway, and then back to Aguirre, put a gun against Aguirre's chest, and fired. Aguirre heard ringing after the shot and felt pressure in his chest. He denied hearing defendant speak before firing. Aguirre then turned, saw blood on his hands and squirting from his chest, and fell to the ground. As he lay on the ground, Aguirre heard additional shots and heard Trujillo moan each time he was hit. Prior to the final two shots, defendant said something, which Aguirre could not hear. Aguirre never saw anyone else with a gun.

Aguirre and Trujillo were unarmed throughout the confrontation. Aguirre did not recall having anything in his hands and denied threatening, using force against, or touching defendant. Instead, he recalled, "I was just loud, that's all. I just wanted them off my porch." According to Aguirre, Trujillo was "mad" and screamed and yelled to disperse the group from Aguirre's property.

On cross-examination, Aguirre denied telling a detective that he grabbed defendant's arm. Also, he did not recall writing a statement the following day in his hospital bed, though he did recall talking to detectives. Aguirre noted the handwriting was "very sloppy" and that it was not like his handwriting. In the statement, Aguirre purportedly recalled that defendant got angry because Aguirre was leading him by the arm. Aguirre likewise denied that Harris attempted to

4

intervene and that Aguirre responded that he did not need to call the police.

Greg Harris testified that friends of Guero Troncoso had been sitting on Aguirre's porch when he was not at home. Starting at about 10 p.m. on October 8, Harris saw teenagers and young adults congregating on Aguirre's porch. At around 1:30 a.m., while watching television, his attention was drawn to yelling at Aguirre's porch. According to Harris, it "[s]ounded like [Aguirre]. I knew he was probably just telling them to get off his porch as he'd done before." Aguirre was yelling and swearing at the group. Harris looked out the window and saw Aguirre and his friend, with their car double-parked. Believing Aguirre was going to solve the problem, Harris went back to watching television.

The yelling did not stop and exchanges of words were heard. Harris returned to the window and "heard [Aguirre] on the porch area." Harris also saw a light-complected, bald male "squaring off" with Aguirre, "very macho like arguing." Just then Harris saw a young, thin Latin male run past his bushes. He then heard three shots and saw smoke. Harris ran to the rear of his house and called 9-1-1. Harris never saw a weapon in the hands of Aguirre or Trujillo.

Pedro "Guero" Troncoso recounted approximately five occasions when he spoke to Aguirre about people hanging out on Aguirre's property. Troncoso denied having control over the group, as some were his friends but others, including defendant, were not. According to Guero, he told his friends to stay off of Aguirre's property. During the evening of October 8, Guero saw defendant carrying beers and heading to Aguirre's front porch. Later that night, Guero left the premises and when he returned he saw defendant and Aguirre arguing. Aguirre was pointing his finger at defendant. He estimated the men were three feet apart as they argued.

Guero had remained in his car and could not hear what they were saying. Trujillo was standing behind Aguirre "trying to defend [Aguirre] too," but was not saying anything. Guero never saw Aguirre grab defendant by the arm or Aguirre return to Trujillo's Durango. Guero did not see weapons in Aguirre's or Trujillo's hands. Edgar Serrano attempted to intervene in the argument by pushing defendant back and endeavoring to calm him. Guero then saw defendant push Edgar out of the way, draw a pistol, and fire at Aguirre and then at Trujillo. The gun was not pressed against Aguirre, as three feet separated him and defendant. Guero heard gunshots coming from the area where defendant was. Because he was trying to park his car, Guero could not see the entire confrontation.

Jose Moreno testified that he saw three or four men, including defendant, Jesse "Baby" Medina, Aguirre and Trujillo, in a confrontation. Moreno could tell by the gestures the men were making that they were arguing. Aguirre and defendant were "eye to eye," less than five feet apart. Trujillo was "getting crazy" and the men were all gesturing at one another. Moreno described Trujillo's gesturing as "lifting up his shirt pumping on his chest like hitting -- hitting himself." Moreno never saw any of the parties touch one another. Moreno remained in the car because when he started to exit, he heard gunfire. He could not say how many shots he heard, though it was less than 10. Moreno did not see Aguirre or Trujillo holding weapons at any time during the confrontation.

Erica Lujano arrived at the scene sometime in the late evening of October 8, or in the early morning hours of October 9, with her friend Marie Sell, her sister Amy, and her cousin Sabrina Aponte. They, along with defendant and others, were hanging out in front of a house. About 15

6

minutes after arriving, a Dodge Durango pulled up in front of the house and two men exited. Prior to their arrival, Lujano spoke with defendant and he did not appear intoxicated. The two men approached the house and asked defendant why he was "disrespecting" in front of their house. Defendant responded, "[I]t's fine. We'll leave." Lujano and the other women returned to Marie's car while defendant picked up the beer from the porch and stairs. Thereafter, Lujano stated: "I saw when Sabrina was standing by the door, and I looked, I glanced back and I saw the guy with the long hair ran to his truck and Sabrina said get in the car, [defendant], watch it." Lujano omitted Sabrina's statement when she was interviewed prior to her grand jury appearance and when she testified therein. However, she remembered the statement in the week after she was subpoenaed for trial. She discussed it in the presence of Aponte and defense counsel.

Lujano did not recall seeing anything in the man's hands after he reached into the car. The man then returned to the altercation involving defendant. According to Lujano, defendant and Baby were about five feet from the other two men. Aguirre and Trujillo appeared drunk, were moving their arms a lot, and were fidgety as they argued, while defendant and Baby were still. Lujano saw defendant pull the gun from near his belt and point it at Aguirre and Trujillo. Lujano and her sister ducked down and she heard gunshots. Lujano estimated defendant had the gun out for one to two minutes, while the men argued and approached him, before firing. She estimated 5 to 10 shots were fired.

During trial, defense counsel moved *in limine* to bar questioning of Sabrina Aponte regarding a threat she received. Counsel explained how Aponte filed a police report concerning a phone call wherein a female voice conveyed a threat to Aponte's life, allegedly originating from

defendant. According to the State, the threat occurred between Aponte's grand jury testimony and trial. If Aponte testified and it differed from her previous testimony, the State asserted it should be able to bring out the threat to explain any change in her testimony. When the issue was initially addressed, the State had not determined whether Aponte would be called as a witness. Ultimately, the trial judge concluded, "I can't really rule without seeing exactly how this unfolds, but it would seem to me that this kind of evidence could and very well might be admissible depending on how her testimony goes if she even testifies."

The issue arose again near the close of the State's case-in-chief, when defense counsel indicated he planned to call Aponte as a witness. Counsel sought to bar any cross-examination regarding the threat because it could not be linked to defendant and allowing it would be prejudicial, by painting defendant in a negative light. Additionally, defense counsel claimed that if the threat were to come out during cross-examination, "it could have a chilling affect [*sic*] on the defendant's lawyer's decision as to whether to call this *** witness or not and I think [Aponte] does add something to the defendant's claim of justifiable use of force." The State again maintained that it would be important to examine this matter if Aponte's testimony differed from her grand jury testimony or if she denied having been threatened. Once again, the court observed that much depended upon how Aponte testified and denied the motion to bar cross-examination of Aponte as to the alleged threat. The State would be permitted to use threat evidence to establish why Aponte's testimony at trial differed from her grand jury testimony, if such a situation arose.

Following denial of defendant's motion for a directed verdict, the issue arose again. The

trial judge confirmed his earlier ruling that impeachment with the alleged threat would be permitted only if the State sufficiently established that Aponte's testimony differed from her previous testimony. Defense counsel then indicated:

> "Judge, maybe I can put this to rest on behalf of the defendant. Given the Court's ruling you just articulated regarding the so-called report of a threat, based on that ruling, the defendant is not going to be calling Sabrina Aponte as a witness because we believe the prejudicial effect that would have on the jury towards my client *** greatly would outweigh any probative effect her testimony would have."

The defense then called Detective Daniel McNally, who visited Aguirre in the hospital after the shooting. According to McNally, on October 10, 2005, Aguirre was intubated at the time and unable to speak, but wrote out a statement about what happened. A portion of the statement read, "He got pissed off because I was leading him by the arm."

Defendant testified that, on October 8, 2005, he did not possess anything to protect himself. When he arrived at Guero's house, he had not consumed any alcohol, but had smoked marijuana. Around midnight, his fiancée, Sabrina Aponte, arrived with three other females, including Erica Lujano. Approximately 10 minutes later a Dodge Durango drove down the street on two occasions, "the second time they had came through, they started reversing, I guess like double parking." Defendant did not know the men in the car. Then, Baby suggested that defendant watch the Durango. In turn, defendant told Aponte to watch out.

Two men got out of the Durango and began "yelling and cursing at us." Specifically, Trujillo, the driver, was yelling and cursing. Trujillo first said, "You and your bitches get the fuck

9

out of here." Defendant responded, "Hold on, who are you?" Trujillo claimed it was his house and told defendant and his cohorts to leave. Defendant replied, "Calm down, we leaving anyway" and told the women to get in the car. As defendant collected the beer, Trujillo and Aguirre complained about people come over and making a mess on Aguirre's property. One of the men said he had told Guero and a man named Dean to stop people from congregating on the property. Defendant asked about the connection to Dean, who was one of defendant's "older associates."

Thereafter, Sabrina exited the car and told defendant to "watch out" and that one of the men was "getting something." According to defendant, "So, I turned my attention back towards their direction and I saw Luis Aguirre in the passenger side of the Durango like underneath the passenger seat." Someone mentioned the word "police," but defendant did not know who said it. Aguirre said words to the effect that he did not need the police. Defendant further testified:

> "I told him what are you on. And after that, you know, when the Durango was reversing backwards, Jesse handed me a firearm, you know. And that's when I went back to ask Luis and them what are you on. I had grabbed the firearm out of my waistband and I pointed it at them, like man put your hands up, man, what you all on, we leaving, you know. Calm down."

Aguirre then "reached for his back behind his jacket and I shot him." According to defendant, he aimed for his chest. Defendant did not see a gun, but was "not going to wait to see it and get shot." Aguirre never threatened defendant. Yet, he took Aguirre's "motions" as a threat.

Defendant's attention turned to Trujillo, whom he saw coming toward him and "reaching for his shirt." When Trujillo did so, defendant opened fire. Defendant "felt like they were pulling

10

a gun" on him. Based upon the trip to the car and the reaching into their shirts, coupled with his experiences "growing up in the city" and having been shot before, defendant figured they were pulling guns, and he shot first. After the first shot at Trujillo, defendant held onto the trigger because Trujillo kept coming at him. Defendant continued to fire at him as he fell to the ground.

Though defendant claimed to have frequented the area, he denied knowing Aguirre and "[n]ever paid any attention to him." Aguirre attracted defendant's attention on October 9, 2005, because he drove down the street twice. According to defendant, anyone who did so would have received his attention. When asked if a car looking for parking, as Aguirre was, was sufficient for defendant's associate to hand him a gun, defendant responded, "Could have been a drive by. You never know."

Defendant explained that Aguirre did touch him at one point. He recounted it as follows: "He grabbed me by the arm but it was nothing like fighting type, it was more like trying to treat me like a little kid or something." In response, defendant indicated to Baby a desire to leave. At no time did Aguirre strike or hit him. Defendant denied that either he or Aguirre ever raised their voices toward one another. Likewise, defendant did not consider any of Aguirre's words threatening. However, defendant claimed Aguirre raised his voice and was threatening toward Baby.

## ANALYSIS

We first address the claim that the trial court erred in refusing to bar cross-examination of Sabrina Aponte regarding the alleged threat on her life. Defendant maintains that the trial court's denial of the *in limine* motion curtailed his ability to corroborate his affirmative defense. The

State asserted it would only address the threat if her trial testimony differed from her grand jury testimony. As noted, after initially holding its ruling in abeyance, the trial judge denied the motion. According to defendant:

> "The ruling left the defendant with [the] unenviable decision of either calling Aponte as a witness and allowing the jury to hear that the defendant allegedly threatened her, or, not calling her and forfeiting the essential corroboration of the defendant's testimony that Aguiree went to the truck and that Aponte warned Gomez to be careful as it appeared Aguirre was getting something."

Consequently, defendant did not call Aponte as a witness and thereby was "precluded *** from perfecting a legal and supportable affirmative defense."

Generally, rulings on motions *in limine* are reserved for the discretion of the trial court and are not subject to reversal unless that discretion is abused. *People v. Nelson*, 235 Ill. 2d 386, 420, 922 N.E.2d 1056, 1075 (2009). A court will be found to abuse its discretion when a ruling is arbitrary, unreasonable, or fanciful or the ruling adopts a view no reasonable person would take. *People v. Delvillar*, 235 Ill. 2d 507, 519, 922 N.E.2d 330, 338 (2009).

As noted, defendant chose not to call Aponte to testify. Defendant's choice dooms his claim of error. Our conclusion finds support from the analogous line of cases addressing motions *in limine* to preclude admission of prior convictions against a defendant, including *Luce v. United States,* 469 U.S. 38, 83 L. Ed. 2d 443, 105 S. Ct. 460 (1984), *People v. Whitehead*, 116 Ill. 2d 425, 508 N.E.2d 687 (1987), and *People v. Averett*, Nos. 106362, 106621 cons. (April 15, 2010). Those cases stand for the proposition that a defendant must testify in order to challenge the

deferral of a ruling on an *in limine* motion. In the present case, the trial judge ultimately denied the motion. As the supreme court noted in *Whitehead*, the logical framework behind its holding was based upon the Supreme Court's ruling in *Luce*. There, the Supreme Court held a defendant must testify to preserve a claim of error because attempting to divine the trial court's ruling whether to allow such an attack was purely conjectural, just as it was conjecture as to whether the prosecution would endeavor to impeach with prior convictions. *Whitehead*, 116 Ill. 2d at 444, 508 N.E.2d at 694, quoting *Luce*, 469 U.S. at 42, 83 L. Ed. 2d at 448, 105 S. Ct. at 463.

In the case *sub judice*, Aponte never testified, which, consistent with *Luce* and its progeny, makes any analysis of what might have happened entirely conjectural. Contrary to defendant's claim, the absence of this testimony did not preclude him from corroborating his affirmative defense premised upon a warning that Aguirre grabbed something from the car. The record demonstrates that similar testimony was developed through Erica Lujano. Since Lujano's testimony was not meaningfully controverted, it could well be argued Aponte's testimony on this point would simply be cumulative of what was already before the jury. Additionally, defendant testified about Aponte's warning, lending further credence to the statement as well as corroborating Lujano's testimony. Therefore, for the reasons noted, we find this claim to be without merit.

Additionally, and more basically, the trial judge's ruling denying the motion was consonant with established case law. Had the situation arisen, wherein Aponte testified inconsistently with her prior testimony, impeachment by way of her prior grand jury statement would have been proper. See *People v. Barajas*, 322 Ill. App. 3d 541, 556, 749 N.E.2d 1047, 1058 (2001). Fear

for one's own safety is properly admitted when used to illustrate why a witness had given inconsistent statements. *Barajas*, 322 Ill. App. 3d at 556, 749 N.E.2d at 1058. Importantly, testimony concerning the witness's concerns could easily be carefully tailored by the trial court so as to explain the reason without impugning or prejudicing defendant thereby. Nevertheless, the failure to call Aponte to testify prevents full development of this issue for our review. Consequently, the claim must fail.

We next consider whether the trial court erred in admitting defendant's prior conviction for aggravated discharge of a firearm. According to defendant, the State's motivation for bringing out the prior conviction, other than general impeachment, was to establish his propensity for violence, to demonstrate he was the initial aggressor, and to show his disrespect for society. As this issue stems from a ruling on a motion *in limine*, we review this claim of error for abuse of discretion. *People v. Patrick*, 233 Ill. 2d 62, 68, 908 N.E.2d 1, 5 (2009). Established precedent instructs that decisions concerning the admission of a defendant's prior convictions must be based upon the weighing of the probative value as against the danger of unfair prejudice. *Patrick*, 233 Ill. 2d at 68, 908 N.E.2d at 5, citing *People v. Montgomery*, 47 Ill. 2d 510, 517, 268 N.E.2d 695, 699 (1971). However, this balancing only occurs if the prior conviction occurred within the preceding 10 years and "the prior crime was punishable by death or imprisonment in excess of one year, or involved dishonesty or false statements, regardless of punishment." *Patrick*, 233 Ill. 2d at 69, 908 N.E.2d at 5.

Defendant argues that admitting a prior conviction for the purpose of establishing defendant's disrespect for society is improper. Admittedly, the State's argument did touch upon

this rationale. Yet, the record demonstrates this was not the rationale invoked by the trial judge in deciding the motion. Importantly, our task is to determine whether the trial court properly exercised discretion in its decision. See *Patrick*, 233 Ill. 2d at 68, 908 N.E.2d at 5. We are not persuaded, necessarily, with the arguments offered by the parties in support of their respective positions.

As our supreme court explained in *People v. Naylor*:

"When a defendant testifies on his own behalf, the record of the defendant's prior conviction is not introduced, and cannot be considered, for the purpose of proving the defendant's guilt or innocence of the crime for which the defendant is being tried; rather, it is admissible only for the purpose of discrediting the defendant as a witness."

*People v. Naylor*, 229 Ill. 2d 584, 594, 893 N.E.2d 653, 660 (2008).

This position is consistent with the terms of section 115-16 of the Code of Criminal Procedure of 1963 (725 ILCS 5/115-16 (West 2006)), which provides:

"No person shall be disqualified as a witness in a criminal case or proceeding by reason of his or her interest in the event of the case or proceeding, as a party or otherwise, or by reason of his or her having been convicted of a crime; but the interest or conviction may be shown for the purpose of affecting the credibility of the witness." 725 ILCS 5/115-16 (West 2006).

In matters such as the case *sub judice*, where a defendant claims self-defense or otherwise attempts to justify his actions, his testimony necessarily places his credibility at issue. The record reveals that the trial judge carefully considered the motion *in limine* and balanced the probative

1-08-2266

value of the prior conviction as against the danger of unfair prejudice to the defendant.

Specifically, the trial judge applied the supreme court's finding in *People v. Williams*, 161 Ill. 2d

1, 641 N.E.2d 296 (1994), noting particularly the *Williams* court's holding that the prior

convictions may be admissible for some other purpose. In the present case, that basis of relevance

derived from defendant's indication that he would claim self-defense. Consequently, the prior

conviction could be relevant to the issue of whether defendant was the initial aggressor. In sum,

the trial court found the prior conviction was probative and the probative value of it outweighed

any prejudice inuring from its introduction. Having considered the trial court's ruling and its

bases, we conclude the trial court did not abuse its discretion in admitting the prior conviction.

Defendant asserts a related claim of error in admitting the prior conviction based upon the

"initial aggressor" theory. This claim relates to the trial court's decision to allow the admission of

a prior conviction of Rafael Trujillo. In support of this contention, defendant argues his

conviction for aggravated discharge of a firearm was improperly admitted because it "had nothing

to do with dishonesty or false statement." Facially, this is accurate insofar as defendant's prior

conviction is concerned. However, this argument understates the *Montgomery* rule. As noted,

the threshold guidelines for admission involve the age and character of the prior conviction.

*Montgomery*, 47 Ill. 2d at 516-17, 268 N.E.2d at 698-99. Moreover, precedent instructs that

admissible prior convictions are either punishable by one year or more in prison – *i.e.*, felonies –

or involving dishonesty or false statement. See *People v. Slabaugh*, 323 Ill. App. 3d 723, 726,

753 N.E.2d 1170, 1173 (2001) ("[P]rior convictions for impeachment purposes should be limited

to crimes punishable by imprisonment for more than one year (felonies) or any crimes involving

16

dishonesty"). The qualifying or admissible types of prior convictions are separated by "or" in each case. While our supreme court "has also recognized that 'and' is often used interchangeably with 'or,' the meaning being determined by the context" (*County of Du Page v. Illinois Labor Relations Board*, 231 Ill. 2d 593, 606, 900 N.E.2d 1095, 1102 (2008)), the context here can yield only the singular conclusion that the guideposts for admission were named in the disjunctive, rather than the conjunctive. Therefore, defendant's attempt to limit the application of this rule is unavailing, as is his claim of error.

In defendant's statement of the issue concerning the admission of his prior conviction, he refers to prior convictions as substantive evidence. This point is not argued in any discernible way in his brief. Moreover, no authority is cited to support any argument along these lines. Supreme Court Rule 341(h)(7) provides, in relevant part, "Points not argued are waived ***" 210 Ill. 2d R. 341(h)(7). Consequently, to the extent defendant claims the prior conviction was admitted as substantive evidence, this claim is waived.

We next address defendant's claim that "The trial court erred when it failed to instruct the jury on second degree murder based on provocation resulting from the aggressive and threatening conduct of Aguirre and Trujillo." It is axiomatic that "fundamental fairness requires that the trial court fully and properly instruct the jury on the elements of the offense, the burden of proof, and the presumption of innocence." *People v. Pierce*, 226 Ill. 2d 470, 475, 877 N.E.2d 408, 410 (2007), citing *People v. Williams*, 181 Ill. 2d 297, 318, 692 N.E.2d 1109, 1121 (1998). Typically, issues concerning jury instructions are reviewed for abuses of discretion. *Pierce*, 226 Ill. 2d at 475, 877 N.E.2d at 410. However, when the issue addresses itself to whether the

instruction "conveyed to the jury the law applicable to the case, our review is *de novo*." *Pierce*, 226 Ill. 2d at 475, 87 N.E.2d at 410, citing *People v. Parker*, 223 Ill. 2d 494, 501, 861 N.E.2d 936, 939 (2006).

Generally, it is appropriate to instruct the jury on defense theories supported by the evidence at trial, even if it is only slight. *People v. Davis*, 213 Ill. 2d 459, 478, 821 N.E.2d 1154, 1165 (2004), citing *People v. Everette*, 141 Ill. 2d 147, 156, 565 N.E.2d 1295, 1298 (1991). "Very slight evidence upon a given theory of a case will justify the giving of an instruction." *People v. Jones*, 175 Ill. 2d 126, 132, 676 N.E.2d 646, 649 (1997), citing *People v. Bratcher*, 63 Ill. 2d 534, 540, 349 N.E.2d 31, 34 (1976). Thus, where some evidence was presented, it is an abuse of discretion to refuse to instruct the jury. *Jones*, 175 Ill. 2d at 131-32, 676 N.E.2d at 649.

As the Supreme Court observed in *Mathews v. United States*, "As a general proposition a defendant is entitled to an instruction as to any recognized defense for which there exists evidence sufficient for a reasonable jury to find in his favor." *Mathews v. United States*, 485 U.S. 58, 63, 99 L. Ed. 2d 54, 61, 108 S. Ct. 883, 887 (1988). This proposition understandably embraces defendants charged with homicides and entitles them to an instruction on self-defense "where there is some evidence in the record which, if believed by a jury, would support the defense." *Everette*, 141 Ill. 2d at 156-57, 565 N.E.2d at 1299. Yet, this entitlement is not without limits:

> "This court has held that 'very slight evidence upon a given theory of a case will
> justify the giving of an instruction,' but we must be wary so as not to permit a
> defendant to demand unlimited instructions based upon the merest factual reference
> or witness' comment. [Citation.] Where self-defense is not supported by the

evidence, an instruction thereon may properly be refused." *Everette*, 141 Ill. 2d at 157, 565 N.E.2d at 1299.

In the present case the jury was instructed on both self-defense and second degree murder premised on imperfect self-defense. Defendant does not take issue with these tenets of law. Rather, he contends the trial court erred in not instructing the jury on a theory of second degree murder based on provocation-passion emanating from what he perceived as "aggressive and threatening conduct" by the victims. Section 9-2 of the Criminal Code of 1961 defines second degree murder as follows:

"(a) A person commits the offense of second degree murder when he commits the offense of first degree murder *** and either of the following mitigating factors are present:

(1) At the time of the killing he is acting under a sudden and intense passion resulting from serious provocation by the individual killed or another whom the offender endeavors to kill, *** or

(2) At the time of the killing he believes the circumstances to be such that, if they existed, would justify or exonerate the killing under the principles stated in Article 7 of this Code [(720 ILCS 5/7-1 *et seq.*)], but his belief is unreasonable.

(b) Serious provocation is conduct sufficient to excite an intense passion in a reasonable person." 720 ILCS 5/9-2 (West 2006).

To date, Illinois courts have only recognized four particular types of circumstances of

serious provocation, including substantial physical injury or assault, mutual quarrel or combat, illegal arrest, and adultery with the offender's spouse. *People v. Leach*, 391 Ill. App. 3d 161, 178-79, 908 N.E.2d 120, 135 (2009), citing *People v. Chevalier*, 131 Ill. 2d 66, 71, 544 N.E.2d 942, 944 (1989). In the trial court and, once again, before us, defendant seeks to bring forth a fifth type of serious provocation. We decline to do so. Manifestly, the existing categories are based upon actual and ascertainable conduct or action. Furthermore, our supreme court has continually adhered to the principle stating, "Mere words and gestures, however, are not enough to constitute serious provocation." *People v. Blackwell*, 171 Ill. 2d 338, 358, 665 N.E.2d 782, 791 (1996). What defendant suggests is a category of serious provocation based upon a defendant's subjective interpretation of the situation, including the victims' words and gestures. Yet, defendant's own testimony undermined any claim of aggressiveness or threatening behavior on the part of the victims. Defendant did not offer any testimony to indicate that he felt threatened by the victims, even when he was allegedly taken by the arm. In defendant's words, "[Aguirre] grabbed me by the arm but it was nothing like fighting type, it was more like trying to treat me like a little kid or something." The closest he can muster is a sense of annoyance or frustration, expressed to Baby by saying, "let's go, fuck these niggers, man," which is not enough to constitute serious provocation.

Moreover, even assuming the existence of a category of serious provocation to encompass defendant's claims, we find defendant did not present even slight evidence to support the giving of such an instruction. Consequently, the trial court did not abuse its discretion in denying the requested instruction. Defendant's claim is without merit.

Finally, defendant next claims the trial court erred in sustaining the State's objections during the defendant's testimony. According to defendant, the sustained objections prevented him from fully eliciting his state of mind, which bore upon his theory of defense. As this claim of error addresses itself to evidentiary rulings, we review those rulings under the abuse of discretion standard. *People v. Wheeler*, 226 Ill. 2d 92, 132, 871 N.E.2d 728, 750 (2007).

In support of his argument, defendant cites *People v. Harris*, 8 Ill. 2d 431, 436, 134 N.E.2d 315, 318 (1956), for the proposition that "he should have been allowed to testify about his intention, motive or belief." *Harris* does not support defendant's argument when the full context is understood. What defendant cites represents only one-half of the cited sentence. The entire statement is as follows: "In such cases the defendant's state of mind is material and a proper subject of examination, [citations], *yet this does not warrant the use of leading or other improper interrogatories.*" (Emphasis added.) *Harris*, 8 Ill. 2d at 436, 134 N.E.2d at 318. The latter clause unmistakably and absolutely undermines defendant's claim of error.

Defendant also cites to *People v. Pernell*, 72 Ill. App. 3d 664, 668, 391 N.E.2d 85, 88 (1979). In *Pernell*, our third division found error where general objections were sustained as to questions eliciting defendant's state of mind concerning his shooting of the victim. The questions in *Pernell* were properly posed and in proper form. In these ways, the situation in *Pernell* differs importantly from the case *sub judice*. Defense counsel's questions of defendant were not in proper from and properly objected to – with specific objections – and the objections were properly sustained.

Likewise, defendant cites *People v. Williams*, 45 Ill. App. 3d 338, 343, 359 N.E.2d 736,

739 (1977), where our second division found the trial court unduly restricted the examination of the defendant as to his state of mind. In that case, the court was unable to conclude the error was harmless because it was deemed "crucial testimony." The same cannot be said here. The evidence was devoid of any reasonable basis for defendant's actions or the magnitude thereof. Because we find the trial court's rulings were not in error, we need not engage in the harmless error assessment undertaken in *Williams*.

Inasmuch as the various objections to the examination of defendant were legally correct, the rulings did not constitute abuses of discretion. The evidence counsel sought to elicit was potentially relevant. However, in order to secure its admission it was incumbent upon counsel to pose proper questions. We discern no reason why doing so was uniquely difficult or unmanageable in the present case. Therefore, we find this claim of error is similarly unavailing.

For the foregoing reasons, we affirm the judgment of the circuit court of Cook County.

Affirmed.

FITZGERALD SMITH and LAVIN, JJ., concur.